UNITED STATES of America, Plaintiff-Appellant,

v.

Albert MAST, Defendant-Appellee.

No. 810, Docket 83–1389.

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1984.

Decided June 1, 1984.

Joseph M. Guerra, III, Asst. U.S. Atty., Salvatore R. Martoche, U.S. Atty., W.D. N.Y., Buffalo, N.Y., for plaintiff-appellant.

David M. Yellen, Buffalo, N.Y., for defendant-appellee.

Before NEWMAN and KEARSE, Circuit Judges, and TENNEY, Senior District Judge.*

TENNEY, Senior District Judge.

This is an appeal from an order of the District Court for the Western District of New York, John T. Elfvin, *District Judge,* granting defendant's motion to suppress statements made by him to a special agent of the United States Department of Agriculture. The principal question on appeal is whether the defendant's Fifth Amendment privilege against compelled self-incrimination bars the admission of incriminating statements made in a noncustodial setting to a special agent of the United States. For the reasons outlined below we hold that under the circumstances of this case the Fifth Amendment privilege does not bar the admission of these statements, and we reverse.

## BACKGROUND

After a two count indictment was filed charging the appellee, Albert Mast ("Mast"), with converting crops pledged to the Commodity Credit Corporation in violation of 15 U.S.C. § 714m(c) (1976), he moved for an order to suppress certain statements. The statements had been made to Special Agent Leonard Ringel ("Special Agent Ringel") of the Department of Agriculture during the course of the investigation that led to Mast's indict-

* Of the Southern District of New York, sitting by designation.

ment. Mast argued that the statements were involuntary and, thus, that their admission would violate his Fifth Amendment privilege against compelled self-incrimination. Mast claimed that the statements had only been made after he had been told, first, that he did not need an attorney and, second, that he would not be prosecuted for the crop conversion if he made restitution. The district court agreed and granted the motion to suppress.

The events leading up to the suppression order were as follows. In November 1981 Mast received two crop loans for approximately $180,000 from the Commodity Credit Corporation, an agency of the federal government. The loans were administered by the Erie County New York Office of the Agricultural Stabilization and Conservation Service ("A.S.C.S."). The loans were secured by soybeans and corn that Mast had in storage. The loan agreements required the prior approval of A.S.C.S. before the crops in storage could be sold. On December 7 and 8 Mast sold a portion of the soybean crop without authorization. Four days later on December 12, after receiving permission from A.S.C.S., he sold the remaining portion of the soybean crop. As a result of this sale A.S.C.S. received approximately $14,000 toward repayment of the loan. During March 1982 Frank Newton ("Newton"), the County Executive Director of the A.S.C.S., discovered that Mast had also sold the corn crop without approval. At that time Mast was informed that he had thirty days to repay the loans. After Mast failed to meet this deadline, he was asked to meet with the County Committee of A.S.C.S. At the meeting he was told that if he repaid the loans no further action would be taken. In the meantime the Committee contacted the company that purchased the corn from Mast and notified it that the crop had secured a loan. The company made two payments of $23,000 and $5,000 directly to A.S.C.S. on June 16 and July 21, 1982 respectively. These were the last payments that were received on the loans. Mast, himself, made no further repayments on the loans. Thus, A.S.C.S. has received $42,000 toward repayment of the loans.

Eventually, the Department of Agriculture assigned Special Agent Ringel to investigate Mast's unauthorized crop sales. On August 26, 1982 Special Agent Ringel called Mast from Newton's office. He told Mast that he had been assigned to investigate the alleged unauthorized crop sales and that he wanted to meet with Mast to discuss this. Mast agreed to meet with Ringel and also agreed to bring documents relating to the soybean sales to the meeting.

The meeting, attended by Mast, Special Agent Ringel and Newton, was held on September 7, 1982 in Newton's office. Special Agent Ringel commenced the meeting by identifying himself and explaining that he wanted to discuss the allegations regarding the unauthorized crop sales. After Mast agreed to discuss these matters, Special Agent Ringel recited the *Miranda* warnings from an advice of rights form [1]

---

1. The waiver of rights form Mast signed is set out below:

#### WAIVER OF RIGHT TO ADVICE OF COUNSEL AND OF RIGHT TO REMAIN SILENT

Before I ask you any questions, you must understand your rights which are:

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before I ask you any questions and to have him with you during questioning.

If you decide to answer questions with or without a lawyer present, you will have the right to stop answering at any time.

If you cannot afford a lawyer one will be appointed for you by the U.S. Magistrate [*]

However—

You may waive your right to advice of counsel and your right to remain silent, and you may answer questions or make a statement without consulting a lawyer if you so desire.

#### WAIVER

I have had read to me, and I have read, the above statements as to my rights and I now understand what my rights are. I have been advised as to the general nature of the inquiry being made. I am willing to make a statement and answer questions.

I do not want a lawyer.

I have talked with my lawyer, _____ but do not wish to have him present during questioning.

My lawyer, _____, is present with me.

and asked Mast whether he understood these rights. Mast stated that he did. Agent Ringel then asked Mast to read the waiver provision of the form and to indicate whether he wanted an attorney by marking the appropriate item on the form. Before marking and signing the form, Mast asked Newton if he thought that he, Mast, should have an attorney. Newton responded, "I don't know, but I don't think so." He also told Mast that he did not think it would do any harm if Mast signed the form. After Mast signed the form,[2] Special Agent Ringel told him that he had the right at any time to stop talking and consult an attorney. Special Agent Ringel then proceeded to question the defendant about the crop sales. During the course of the discussion the defendant gave Special Agent Ringel the documents that he requested. At the conclusion of the meeting Special Agent Ringel told the defendant that he was going to prepare a written statement of their meeting and asked the defendant to meet with him again to review the statement. He also asked Mast to bring some additional documents to the second meeting.

On September 13, 1982 the second meeting was held among the same three individuals. At that time Special Agent Ringel informed the defendant that his rights were still in effect. He did not, however, provide the defendant with a second advice of rights form. Special Agent Ringel and Mast reviewed the statement, which was written in the first person singular as if the defendant were speaking. After making a few modifications the defendant signed the statement. He also provided the requested documents. Sometime during the course of the meeting Newton warned Mast that the matter was now "in the hands of an attorney"—an apparent reference to the Assistant United States Attorney assigned to the case.

The eight-page statement prepared by Special Agent Ringel delineates the facts concerning the loans and the unauthorized sales. In the statement Mast admits that he knew that the sales were illegal because they were made without the prior approval of A.S.C.S., but states that he did not intend to violate federal law and that he expected to receive commercial credit to pay the indebtedness. He also acknowledges in the statement that it may be used as evidence.

Subsequently, at a pretrial conference Mast made an oral motion to suppress all the statements that he made to Special Agent Ringel and Newton. At the suppression hearing Newton testified that Mast stated that he hoped to refinance the loans. Newton also testified that it was his understanding during the meetings that if Mast repaid the loans he would not be criminally prosecuted. Special Agent Ringel, however, testified that at no time during the meetings did he make any promises to Mast regarding his potential prosecution, and that Mast spoke voluntarily on both occasions. Mast did not testify at the hearing. The district court found that the defendant was "continuingly ... given to understand [by Newton] that he was not going to be prosecuted criminally" if he repaid the loans. *United States v. Mast*, Cr. 82–149 (W.D.N.Y. Oct. 10, 1983) (Memorandum and Order), at 4.[3] In light of this

---

I understand and know what I am doing. No promises or threats have been made to me and no pressure or coersion of any kind has been used against me.

Name _____

Date _____

Witness:

_____

SPECIAL AGENT
OFFICE OF INVESTIGATION
U.S. DEPARTMENT OF AGRICULTURE
Date _____

The sentence with the asterisk after it was handwritten on the form.

2. Mast put a check mark after the sentence "I do not want a lawyer." See *supra* note 1. The form was signed by Mast and was witnessed by Special Agent Ringel and Newton.

3. If the District Judge intended to find an unconditional promise not to prosecute, as one sentence of his opinion arguably suggests, such

finding the court held that the admission of the written statement or any other statements by Mast would violate his Fifth Amendment privilege against self-incrimination.

## DISCUSSION

■ On appeal the government presents two arguments. First, it contends that the district court erred when it found that the defendant was promised that he would not be prosecuted if he repaid the loans. Second, the government argues that even if Mast had been promised this, his statements were still voluntary and thus the evidence should not have been suppressed. The government's first argument concerning the promises made to Mast need only detain us momentarily. The settled rule is that a district court's findings of fact may not be disturbed unless the findings are clearly erroneous. *See United States v. Isom,* 588 F.2d 858, 862 (2d Cir.1978). Although the testimony at the suppression hearing is not particularly clear, the record in this case does not demonstrate that the district court's finding regarding Newton's promise is clearly erroneous.

■ The more important question is whether the conduct of the government agents during the noncustodial interrogation[4] violated Mast's Fifth Amendment right against compelled self-incrimination. Mast in essence argues that his statements were involuntary because the government agents deceived him into believing that the investigation was civil and would not lead to a criminal prosecution. According to Mast, he was deceived by Newton's promise that he would not be prosecuted if he repaid the loans, and by Newton's statements that he did not need an attorney and

that it would do no harm to sign the waiver of rights form. He also contends, for the first time on appeal, that Special Agent Ringel misled him because the agent did not affirmatively state that the investigation was criminal in nature. Mast asserts that since his statements were involuntary his Fifth Amendment privilege against compelled self-incrimination was violated.

■ "When such a claim is raised, it is the duty of an appellate court ... 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (quoting *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764–65, 16 L.Ed.2d 895 (1966)). In this circuit

the test of voluntariness [of a confession] is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined ...." *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961).

*United States v. Pomares,* 499 F.2d 1220, 1222 (2d Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974) (quoting *United States v. Ferrara,* 377 F.2d 16, 17 (2d Cir.), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967)). Factors to be considered in making a determination of voluntariness include, but are not limited to, the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation. *See United States v. Venator,* 568 F.Supp. 832, 835 (N.D.N.Y.1983) (citing cases).

---

a finding would be clearly erroneous in light of the undisputed evidence that the promise was conditioned upon repayment of the loans.

**4.** The defendant was not in custody or in any way deprived of his freedom at either meeting. Therefore, the dictates of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) were not applicable. *See United States v.*

*Burke,* 700 F.2d 70, 84 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). Moreover, since no adversarial proceedings had begun and Mast was merely the subject of an investigation at the time of the meetings, he did not have a Sixth Amendment right to counsel. *See United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1982).

■ After examining the totality of circumstances in this case we are convinced that nothing that Special Agent Ringel or Newton did or said during the course of the two meetings was sufficient to overcome the defendant's free will. First, it should have been absolutely clear to Mast that he was no longer the subject of only a civil proceeding when Special Agent Ringel identified himself, gave the *Miranda* warnings, and asked Mast to read and sign a waiver of rights form.

Second, Newton's promise to Mast—that he was not going to be prosecuted if he repaid the loans—is not the type of inducement that would render Mast's statements involuntary under the circumstances of this case. *See, e.g., Ferrara, supra.* It is clear that the government did not offer Mast either immunity or a plea bargain at the meetings. To the extent that any "bargain" did exist between the government and Mast, it was conditioned on Mast's promise to repay the loans. Since Mast has not repaid the loans, he has not lived up to his end of the bargain. Therefore, he cannot rely on the bargain to complain about the admission of the statements. *See United States v. Snyder,* 428 F.2d 520, 522 (9th Cir.), *cert. denied,* 400 U.S. 903, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970) ("[Defendant] cannot renege [on bargain] and then seek the protection of the courts so that he may go scot-free in spite of his own duplicity.").

There is also no indication in the record that the promise induced Mast to make the statements or that Newton or Special Agent Ringel affirmatively attempted to mislead Mast about the nature of the investigation. *See, e.g., United States v. Serlin,* 707 F.2d 953, 956 (7th Cir.1983) (misinformation must be material in defendant's decision to talk to agents and must be the result of the agents' affirmative attempt to mislead the defendant about the nature of the investigation); *United States v. Cohen,* 317 F.Supp. 1049, 1051 (D.Neb.1970), *aff'd,* 448 F.2d 654 (8th Cir.1971), *cert. denied,* 405 U.S. 926, 92 S.Ct. 975, 30 L.Ed.2d 799 (1972) (same). The record indicates that at the first meeting Mast agreed to waive his rights and discuss the unauthorized crop sales with Special Agent Ringel before Newton made any promises about potential prosecution. Ringel apparently made no promises to Mast. Further, while Newton may have made promises to Mast, he also warned Mast at the second meeting that the matter was now in the hands of an attorney. While the meaning of this warning may have been ambiguous, it demonstrates that Newton was not affirmatively attempting to mislead Mast about the nature of the investigation.

■ Thus, the record does not support Mast's assertion that the government officials attempted to deceive him about the nature of the meetings. What the record does show is that Mast made inculpatory statements as a result of a desire to cooperate with Special Agent Ringel's investigation. Inculpatory statements, however, are "not involuntary merely because [they are] made in response to official requests to cooperate ...." *Fisher, supra,* 700 F.2d at 782 (citations omitted). Nor are inculpatory statements rendered involuntary because a defendant's ignorance or momentary inattention has caused him to fail to assert his privilege against self-incrimination. *See Minnesota v. Murphy,* —— U.S. ——, ——, 104 S.Ct. 1136, 1149, 79 L.Ed.2d 409 (1984) (Marshall, J., dissenting) ("It is now settled that, in most contexts, the privilege against self-incrimination is not self-executing.").

Third, Newton's advice about Mast's need for an attorney and his recommendation concerning the signing of the waiver form add no force to Mast's argument that he was misled. At neither meeting did the defendant have a constitutional right to have an attorney present. *See supra* note 4. Moreover, whatever misleading effect these statements may have had on Mast about the nature of the investigation was offset almost immediately by Special Agent Ringel's statement that Mast had a right to stop talking and consult an attorney at any time. While Newton's statements would have been better left unsaid, and this Court

certainly cannot condone a situation where a government official advises the subject of a criminal investigation that he does not need an attorney,[5] the statements taken alone or in combination with the promise not to prosecute--did not overbear Mast's will and "bring about [statements] not freely self-determined . . . ." *Beckwith, supra,* 425 U.S. at 348, 96 S.Ct. at 1617 (quoting *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)).

Before each meeting Mast was told that he had certain rights that could be waived if he went ahead and spoke with the government agents. The first paragraph of the signed statement states that it may be used as evidence. At all times during the two meetings Mast was free to leave or seek the advice of an attorney. He was so informed by Special Agent Ringel. The defendant was not tricked, coerced or restrained in any way during the meetings. He does not allege, nor is there any evidence, that he has any physical or mental disabilities that would have influenced his judgment under the circumstances. In short, while Mast may have had the mistaken belief at the time he made the statements that he would be able to refinance the loans and avoid prosecution, the statements to Special Agent Ringel were clearly freely self-determined. Therefore, we hold that Mast's statements were voluntary and should not have been suppressed. The district court's ruling is reversed, and the case is remanded.

---

**5.** In some special circumstances, not present here, statements similar to those made by Newton may deceive a defendant and require the suppression of his or her statements. Accordingly, the Court strongly recommends that government officials refrain from advising anyone who is the subject of an investigation that he does not need an attorney. The decision to consult an attorney should be left to the individual being questioned.