**UNITED STATES of America, Appellee,**

v.

**Isaac Felipe DIAZ, Appellant.**

**No. 198, Docket 89–1147.**

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1989.

Decided Dec. 14, 1989.

---

Robert C. Dorf, Dorf & Perlmutter, New York City, for appellant.

Matthew E. Fishbein, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., for the E.D.N.Y., Beryl A. Howell, Asst. U.S. Atty., on the brief), for appellee.

Before OAKES, Chief Judge, and LUMBARD and PIERCE, Circuit Judges.

OAKES, Chief Judge:

Isaac Felipe Diaz appeals from his conviction by a jury in the United States District Court for the Eastern District of New York, Thomas C. Platt, Jr., Chief Judge, for nine counts of possessing checks stolen from the United States mails, 18 U.S.C. § 1708 (1982), and one count of conspiring to possess the same stolen checks, 18 U.S.C. § 371 (1982). We reverse the conviction and remand for a new trial.

## FACTS

The Government's case against Diaz centered around nine separate checks sent through the United States mails—five payable to the International Tool Manufacturing Company ("ITM") of Elmhurst, New York, and four more payable to the Catholic War Veterans ("CWV") of Woodside, New York. The five checks intended for ITM ranged in value between $31.45 and $873.00; the four meant for CWV spanned between $8.25 and $60.00. A representative from ITM and another from CWV each

testified that their respective organizations never received the checks in question.

According to the testimony of Benvenido Espejo, who worked the cash register and balanced the account books at a Brooklyn grocery store, or *bodega,* operated by Diaz, from late February through early March of 1988, Espejo began to notice unusually large checks passing through Diaz's store, including some payable to ITM and CWV. Although regular customers from time to time would cash checks at the store, the amounts would rarely exceed $50. Because of the size of some of these checks, however, store revenues shot up markedly towards the end of February. Espejo added that some suppliers returned to the store checks which had been signed over to them, because their makers had stopped payment on them.

Espejo testified that when he asked Diaz about the checks, Diaz told him that Rene Morety[1] and Tony Diaz, who is not related to the defendant, were the persons cashing the large checks. According to Espejo, Diaz said he was paying a discount price on the checks, which, upon later review of the store's books, Espejo concluded averaged out to approximately $200 in cash for every $1000 on the face of the checks. However, several months later, Diaz told Espejo that he had paid the full face amount of the checks advanced by Morety and Tony Diaz. During this later conversation, Diaz admitted to knowing that the checks were stolen.

On March 11, 1988, a Government agent, Postal Inspector Sol Farash, approached Diaz regarding some suspected stolen checks. Diaz first denied knowledge of any of these checks, but after Inspector Farash showed Diaz copies of four checks bearing his signature, Diaz remembered the checks and informed Inspector Farash that Morety and Tony Diaz had cashed approximately twenty checks, including those four, at his store. Diaz told Inspector Farash where Tony Diaz lived and drove with Inspector Farash to show him where he thought Morety lived. The two

were together in the car for approximately twenty minutes, during which time they conversed exclusively in English. Diaz agreed to sign a statement prepared by Inspector Farash which restated that Morety and Tony Diaz had cashed approximately twenty checks at his store. Although Inspector Farash and Diaz previously had communicated only in English, Inspector Farash had Espejo orally translate the statement into Spanish for Diaz before Diaz signed it.

Two months later, on May 2, 1988, Inspector Farash returned to Diaz's store, accompanied by a second inspector, C.F. Scalfani. Inspector Farash requested that Ramon Baez, who was in the store at that time, read Diaz his *Miranda* rights in Spanish from a prepared form which set out the required warnings. Diaz then waived his *Miranda* rights, signing a form, written in Spanish, which listed his rights and acknowledged his waiver of them. Inspector Farash interviewed Diaz for thirty minutes in English and Spanish, using Baez as an interpreter when necessary. Diaz then admitted that because none of the checks cashed at his store by either Morety or Tony Diaz had been made out to them, he did suspect something was amiss but went ahead and cashed them anyway. He added that he generally received a check cashing fee of between $10 and $15 per check. Diaz stated that he did not convey his suspicions to Inspector Farash during their March 11 conversation because he feared he would get himself in trouble. Scalfani transcribed Diaz's responses into a statement which Diaz signed after it was read back to him in Spanish.

Inspector Farash returned one last time, on June 28, 1988, and arrested Diaz. Inspector Farash then took him to the Postal Inspectors' office in New York City. Although Inspector Farash admittedly does not speak Spanish, Inspector Farash read Diaz his *Miranda* rights from a Spanish-language form. Diaz then executed the

---

1. Morety eventually was indicted together with Diaz on the same conspiracy and possession counts, plus an additional possession count, but was prosecuted separately. He ultimately pled

guilty to this additional possession count, which had charged him with possessing a check payable to Vera Gray of Jackson Heights, New York, stolen from the United States mails.

same form he signed on May 2, enumerating his *Miranda* rights and acknowledging his waiver of them. After waiving his rights, Diaz said he knew nothing about the checks in question.

In his defense, Diaz sought to establish that he did not know the checks cashed at his store by Morety and Tony Diaz were stolen. To this end, he recalled Benvenido Espejo and sought to show that Espejo had invested and lost a considerable sum of money in Diaz's store, had been paid for cooperating with the Government, and thus had a motive to lie about Diaz's knowledge regarding the checks' origins. Prior to trial, Diaz had moved to suppress his oral and written statements on grounds they were elicited from him involuntarily, in violation of the Fifth Amendment. The trial court denied the motion. The jury convicted him on the conspiracy count and all nine possession counts.

Diaz was sentenced on March 17, 1989. Although the transcript of the sentencing hearing reflects that Diaz received a sentence of six months' imprisonment, a $75 fine, and a $50 special assessment, the judgment of conviction records the fine as $7,500 and the special assessment as $500. The Government concedes that the proper fine is $75 but asserts that the correct special assessment is $500.

On appeal, Diaz contends that the trial court erred in denying his motion to suppress. Additionally, he asserts that the trial court's charge to the jury that it could infer from Diaz's possession of the stolen checks that Diaz had participated in the theft of the stolen checks was unduly prejudicial and deprived him of a fair trial. Finally, he challenges the $500 special assessment appearing on the judgment of conviction. Although we do not find that the admission of any of the statements Diaz made to the postal inspectors violated his Fifth Amendment rights, we agree with Diaz that the trial court's charge to the jury allowing it to infer his participation in the theft of the checks in question did deprive him of a fair trial. Accordingly, we reverse all counts of the conviction and remand for a new trial. Because we re-

verse the conviction, we do not address Diaz's challenge to the special assessment.

## DISCUSSION

### I. *Fifth Amendment Claim*

Diaz raises several challenges to the admissibility of the incriminating statements he made to Inspector Farash. First, he argues that the trial court erred in not suppressing his signed statements from March 11 and May 2, because the Government, by failing to call the persons who translated those statements for him, Benvenido Espejo and Ramon Baez, to testify to the accuracy of the translations, did not carry its burden of proving that Diaz's adoption of the statements was knowing and voluntary. Second, Diaz likewise argues that because the Government failed to call Baez to testify as to the accuracy of his translation of the *Miranda* warning advanced on May 2, it did not carry its burden of proving that Diaz knowingly and voluntarily waived his *Miranda* rights. Finally, Diaz challenges the *Miranda* warnings delivered to him in Spanish by Inspector Farash on June 28 and similarly alleges that the Government failed to prove their accuracy and thus failed to show that Diaz's waiver on June 28 was knowing and voluntary.

Before addressing the substance of Diaz's Fifth Amendment claims, we first outline the standards governing our inquiry. When a criminal defendant challenges the admissibility of a confession, the Government bears the burden of proving the voluntariness of the confession by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 482–89, 92 S.Ct. 619, 623–27, 30 L.Ed.2d 618 (1972). If the Government asserts that a defendant has waived his Fifth Amendment rights, here, too, it carries the burden of proving waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 167–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986). In evaluating a trial court's finding of fact made in the course of a suppression hearing—for instance, a finding that a criminal defendant spoke with a Government agent at a particular time or at a particular

place—an appellate court will not disturb that finding of fact unless clearly erroneous. *See, e.g., United States v. Kosker-ides*, 877 F.2d 1129, 1131 (2d Cir.1989); *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984). However, a factual finding is to be distinguished from a trial court's conclusion that a defendant offered an incriminating statement knowingly or voluntarily. The latter goes to the ultimate legal issue of whether admission of the confession complies with constitutional mandates, and, accordingly, "it is the duty of an appellate court ... 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (quoting *Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764–65, 16 L.Ed.2d 895 (1966)).

■ Upon our review of the record, we find the trial court correctly ruled that both Diaz's waivers of his *Miranda* rights and his subsequent statements were voluntary. Inspector Farash testified that he had no difficulty communicating in English with Diaz. Diaz's conduct during his conversations with Inspector Farash likewise never indicated that Diaz experienced problems understanding Inspector Farash. Inspector Farash covered his bases by using Benvenido Espejo and Ramon Baez as translators when needed. Additionally, Diaz read a form outlining his *Miranda* rights before he waived them. Likewise, the surrounding circumstances do not indicate that Diaz had difficulty comprehending his translators or, alternatively, that the translators misstated anything to Diaz. Finally, although Inspector Farash, who read the June 28 warnings from a Spanish-language form to Diaz, admits to not speaking Spanish, Diaz read and signed the form stating his rights and acknowledging his waiver. Diaz offers no evidence to show either that Inspector Farash misspoke or that Diaz did not comprehend the form he signed.

■ The evidence from the suppression hearing sufficiently supports the conclusion that Diaz appreciated his *Miranda* rights and the content and nature of the statements he was adopting. Thus, in this instance, we find it unnecessary to go to the lengths urged by Diaz and place on the Government the burden of calling additional witnesses to supplement existing proof of Diaz's knowledge and volition.

## II.  Challenge to the Jury Instructions

■ In charging the jury, the trial court twice instructed it that if it found that Diaz had possessed the checks in question, it could infer from Diaz's possession that he had participated in the theft of the checks, as well. Regarding the inference of participation in the theft, the district court first instructed the jury:

> Possession of property recently stolen if not satisfactorily explained is ... ordinarily a circumstance [from] which the jury may reasonably draw, but need not, the inference and find that in the light of surrounding circumstances shown by the evidence in the case that the person in possession not only knew it was stolen property but also participated in some way in the theft of the property.

Shortly thereafter, it added:

> If you find beyond a reasonable doubt from the evidence in the case that the checks described in the indictment were stolen, and that while recently stolen the property was in possession of the defendant, you may but are not required to from these facts draw the inference not only that the checks were possessed by the accused with knowledge that the property was stolen but also that the accused participated in some way in the theft of the property, unless possession of the recently stolen property by the accused is explained to the satisfaction of the jury by other facts and circumstances in the evidence of the case.

Although the statute under which the jury convicted Diaz for possessing the stolen checks, 18 U.S.C. § 1708, proscribes the theft of property sent through the United States mails, Diaz was charged only for possession and conspiracy to possess, and not for theft. The Government concedes that the charge was gratuitous. Diaz maintains that the charge was not only

gratuitous but moreover was overly prejudicial. We agree with Diaz that the theft charge on balance was prejudicially erroneous.[2]

The Government contends that the trial court's extraneous charge on the issue of theft did not prejudice Diaz in any way. In particular, it notes that in *United States v. Baty*, 486 F.2d 240 (5th Cir.1973), *cert. denied*, 416 U.S. 942, 94 S.Ct. 1948, 40 L.Ed.2d 294 (1974), the Fifth Circuit found the use of this precise instruction in a context quite similar, if not identical, to this case harmless error. There the instruction allowed the jury to infer participation in the theft of checks stolen from the mails by a defendant charged only with knowing possession of the stolen checks. Although acknowledging that the charge was extraneous, the court in *Baty* reasoned that the charge did not attribute to the defendant any greater guilty knowledge than would have existed in its absence and that, in any event, "[t]he jury was still left free to draw its own inferences from all the evidence." *Id.* at 243.

The Government here goes beyond asserting that the charge was benign. If anything, it insists, the charge actually worked to Diaz's advantage by potentially misleading the jury into concluding that theft was another element of the crime that it would have to find to convict Diaz.

We agree with the Government on one point: The charge was potentially misleading. Contrary to the rosy gloss the Government seeks to paint on to the theft charge, we find it more plausible that the charge significantly disadvantaged Diaz. Evidence introduced at trial supported a finding that Diaz did indeed possess the stolen checks, and Diaz's defense essentially conceded this point and instead concentrated upon contesting Diaz's knowledge of the checks' origins. Because Diaz did not dispute possession, given this charge, little stood in the way of the jury presuming Diaz's participation in the theft. Moreover, until the trial court had issued its theft charge to the jury, Diaz had no incentive to offer any evidence to defeat the presumption of his participation in the theft. Diaz was not charged with theft, nor was theft an element of any crime for which Diaz was charged. In sum, it is unavoidable to conclude that the jury did take the district court up on its invitation and presume that Diaz in fact stole the checks.

As we have noted earlier, the key issue facing the jury in deciding whether to convict was whether Diaz knew the checks were stolen. However, before the jury even came around to considering this key issue, Diaz found himself in a deep hole. Once the jury reached its likely conclusion from the trial court's concededly gratuitous charge that Diaz had participated in the theft of the checks, it was a short step from the ultimate conclusion that Diaz possessed the checks knowing them to be stolen. Indeed, if the jury were to have found that Diaz stole the checks, it would have been logically impossible for it then to have concluded Diaz did not know the checks were stolen when he agreed to possess them and later took possession of them. Thus, the jury never had to ask whether Diaz had the requisite mental state to possess knowingly stolen checks or to conspire to possess knowingly stolen checks. When played out to its reasonable conclusion, the trial court's theft charge asked and answered this very question. The charge therefore tended to concentrate the jury on the wrong issue.

**2.** The parties have contested whether Diaz's objection to the theft charge satisfied the requisites of Fed.R.Crim.P. 30. Because we find the charge so prejudicial as to amount to plain error under Fed.R.Crim.P. 52(b), we have no occasion to consider whether Diaz's objection complied with Fed.R.Crim.P. 30.

Additionally, Diaz argues that the combination of the trial court's theft instruction together with its instruction that the jury could find that Diaz possessed the requisite knowledge that the checks in question were stolen, if it concluded that he consciously avoided knowledge of the checks' legitimacy, amounted to an abuse of discretion. Diaz is unclear as to whether he means the combination of the two instructions was erroneous or that the conscious avoidance charge individually was unduly prejudicial, while the theft charge on its own also was unduly prejudicial. However one interprets this contention, because the district court's theft charge provides sufficient basis for reversing Diaz's conviction, we need not review his additional challenge to the jury instructions.

Because the trial court's charge allowing the jury to presume Diaz's participation in the theft of the checks potentially predisposed the jury to convict Diaz, we hold the charge deprived Diaz of a fair trial. Accordingly, we reverse the conviction and remand for a new trial. To the extent our decision is at odds with the Fifth Circuit's holding in *Baty*, we decline to follow it.

Judgment reversed, cause remanded.