**UNITED STATES of America**

v.

**George HERBERT Defendant.**

**No. 03 CR.211 SHS.**

United States District Court, S.D. New York.

April 8, 2004.

---

Anirudh Bansal, U.S. Atty's Office, New Yo9rk City, for USA.

Daniel J. Ollen, New York City, for Herbert.

*OPINION & ORDER*

STEIN, District Judge.

George Enrique Herbert has been charged in a two-count indictment with violating 21 U.S.C. § 963 by participating in a conspiracy to import cocaine into the United States in violation of 21 U.S.C. §§ 812, 952(a) and 960(b)(1)(B)(ii) and dis-tribution of cocaine with the intent that it be imported into the United States in violation of 21 U.S.C. §§ 812, 959(a) and 960(b)(1)(B)(ii). Herbert now moves 1) to dismiss the indictment pursuant to Fed. R.Crim.P. 12(b)(1)(2) on the grounds that this prosecution violates the extradition treaty the United States has entered into with Belize and 2) to suppress any statements made by Herbert while under custodial interrogation in Belize pursuant to Fed. R.Crim. P 12(b)(3). For the reasons set forth below, Herbert's motion is denied.

## I. Background

### A. *The Circumstances Surrounding Herbert's Transfer to U.S. Custody*

On April 11, 2003, U.S. Magistrate Judge Gabriel W. Gorenstein of the Southern District of New York issued a warrant for the arrest of Herbert, a resident and citizen of Belize. (Def. Notice of Mot., Exh. A). Pursuant to the extradition treaty between the United States and Belize, the U.S. Embassy in Belize then sent a diplomatic notice to the Belizian Ministry of Foreign Affairs on April 14, 2003 requesting the "provisional arrest for the purpose of extradition of George Enrique Herbert." (Def.Reply, Exh. A). That document specified the crimes for which Herbert was sought in the United States, and invoked Article 9 of the extradition treaty between Belize and the United States.. (*Id.;* Extradition Treaty Between the Government of the United States of America and the Government of Belize, Mar. 3, 2000, S. Treaty Doc. No. 106–38). Pursuant to that diplomatic request, an order was issued by the Belizian Minister of Foreign Affairs, Geodfrey Smith, to the Belizian Chief Magistrate, Herbert Lord, on April 24, 2003 requiring the Chief Magistrate to issue an "warrant of apprehension" for Herbert. (Def.Reply, Exh. D).

The warrant was never executed because according to Minnet Hafiz, Crown Counsel for the Ministry of Foreign Affairs, "George Herbert ... left Belize voluntarily to go to the USA to face the criminal charges for which [he was] wanted in that country" and not pursuant to a warrant executed under the extradition treaty. (Gov't Mot., Hafiz Aff., ¶ 4).

Jose Zetina, Commissioner of Police in Belize, confirmed that Herbert was not arrested pursuant to the U.S. extradition request. Herbert was arrested by Belizian authorities on April 25 based not on any extradition proceeding, but rather based on information that "gang rivalry, shootings, aggravated assaults and kidnappings were being masterminded by George Herbert ... among others." (Def. Reply, Exh. B, Zetina Aff, ¶ 2). It was pursuant to that information—not the extradition procedure—that Herbert was seized at his home, told the purpose of his arrest, and permitted to contact an attorney. (Zetina Aff., ¶¶ 3, 5). Only after this detention did Commissioner of Police Zetina learn that Herbert's extradition had been requested by the United States. Upon learning of the U.S. interest in Herbert, Zetina permitted the United States Drug Enforcement Agency ("DEA") agents to speak with Herbert. (Id., ¶ 6).

According to Zetina, the DEA agents, after meeting with Herbert, notified him that Herbert had voluntarily waived his rights pursuant to the extradition treaty and had agreed to be transferred to the U.S. (Id.). Accordingly, the Belizian police turned Herbert over to DEA custody on April 26, 2003.[1] The DEA agents then transported Herbert by airplane to New York. (Aff. Richard A. Medina, Ex. ¶ 5). Herbert does not claim that there was any violent or outrageous conduct such as brutality or torture in the course of these proceedings.

## B. Herbert's Statements to Belizian Police

In August of 2002, eight months prior to his arrest, Herbert allegedly had made a series of incriminating statements concerning his involvement in drug trafficking to Belizian law enforcement officials, including a statement that at one time he possessed a substantial amount of cocaine. (Def. Reply, Mem. from Officer Commanding, Special Branch Eastern Division to Head Special Branch, "Herbert Kidnapping Case," Sept. 3, 2002). Herbert requests that those statements be suppressed on the grounds that they were made under circumstances that violated his rights pursuant to United States and Belizian laws. He claims that he "was not free to leave" and "was not permitted access to a lawyer." (Herbert Aff., ¶¶ 3, 4, 5, 6). He refused to sign a statement at the end of the interrogation. (Id.).

The circumstances surrounding that interview were presented at a factual hearing held before this Court to determine whether or not Herbert's August 2002 statements were made voluntarily. The U.S. government introduced the testimony of Assistant Superintendent of the Belizian Police Force Joseph Myvette, who was present when the August 2002 statements were made and also prepared a report of that interview. (Hearing Transcript, Dec. 19, 2003, 14:5–15:12). Assistant Superin-

---

1. It need be noted that whereas the DEA claims that the Belizian official notified it that Herbert had waived extradition (Def.Reply, Exh. E), the Belizian officials, in contrast, state that the DEA notified them that Herbert had waived extradition. (Zetina Aff. ¶ 6; Hafiz Aff. ¶ 4). Herbert contends that he never waived extradition at all. These discrepancies need not be resolved on this motion since the finding of this Court is that Herbert was arrested on April 25, 2003 and was turned over voluntarily by Belize to the custody of the U.S. officers on April 26, 2003 without regard to the treaty procedures.

tendent Myvette testified that Herbert came to the Racoon Street police station in Belize City on the afternoon of August 29, 2002 to report his own kidnapping. (Trans., 18:19–24). Myvette testified that the Racoon Street station is an administrative building and not a detention center. (Trans.16:1–24). An arrested person would not be brought there because it is not equipped to process a detainee and has no detention facilities, according to Myvette. (*Id.*).

Herbert arrived at the Racoon Street station with the Belizian Ombudsman, Paul Rodriguez, and his deputy, Lionel Castillo. (Trans.16:19–13). Myvette described the Ombudsman as a "watchdog which looks into the rights of people" and conducts investigations into the rights of "aggrieved individual[s]." (Trans.19–20). Herbert was neither escorted by armed officers, nor was he handcuffed. (Trans.19:13–20:17). Herbert was interviewed for approximately ninety minutes in the Commissioner's office and no one in that room was armed. (Trans.21:1–26:8). Present at his interview were the Ombudsman and his deputy, Assistant Superintendent Myvette, Police Commissioner Zetina, and one plain clothes officer. (Trans.21). There is no allegation that U.S. agents were involved in the interview. During the interview, Herbert was asked and answered questions and was not forced to make any statements, according to Myvette. (Trans.21.).

Defendant's account of the encounter differs in that he claims he was "brought to police headquarters" by "agents of the government of Belize" and taken to a room where there were four "armed officers." He believed he "was not free to leave" and "was not permitted access to a lawyer." (Herbert Aff., dated Oct. 27, 2003, PP 3–4). At the factual hearing before this Court, Herbert's attorney challenged Myvette's credibility on the grounds that "this testi-

mony is incredible" because it is hard to believe "somebody would ... volunteer that they had a substantial amount of cocaine in their possession...." (Trans. p. 35, 37). In his post-hearing submission, defense counsel makes the same point as follows: "Myvette's entire testimony defies common sense and logic. It is incredible as a matter of law. No other argument need be made with regard to this issue." (Santangelo letter, dated Feb. 3, 2004, p. 3).

## II. Discussion

### A. *The United States–Belize Extradition Treaty Was Not Violated*

■ Herbert contends that the indictment must be dismissed because his extradition to the United States was in violation of the United States–Belize extradition treaty and therefore this Court has no jurisdiction over him. Defendant is incorrect for three reasons. First, the Court finds that he was not transferred to United States custody pursuant to the extradition request of the U.S. authorities, and thus he cannot raise a violation of the extradition treaty as an obstacle to this Court's jurisdiction. Second, defendant has not shown that even if the treaty had been formally invoked, that his transfer was pursuant to that treaty request. Third, even if a violation of the treaty had occurred, Herbert does not have standing to raise that violation here.

### 1. *Herbert Was Not Transferred to U.S. Custody Pursuant to the Extradition Request*

In the face of the affidavits from the Belizian Minister of Foreign Affairs and the Belizian Chief Magistrate as well as the DEA report stating that Herbert willingly left Belize, he now contends that Belize surrendered him to the United States officials pursuant to, but in violation

of, the United States–Belize extradition treaty. He contends that because his extradition violates that treaty, the indictment must be dismissed.

Although the U.S. submitted an extradition request on April 14, 2003, Herbert has in no way supported his contention that he was arrested and turned over to United States custody pursuant to that extradition request. The Commissioner of Police of Belize submitted an affidavit that DEA agent Williams informed him of the extradition request, to which the Commissioner replied that the agents could "speak with" Herbert because he was already in custody. (Zetina Aff. ¶ 5). In addition, Belize voluntarily transferred Herbert to United States custody, without requiring the United States to follow specific, formal procedures required by the extradition treaty.

Moreover, Herbert has in fact contended in a Belizian forum that he was "kidnapped by Belizian authorities and expelled from Belize," rather than extradited. (*George Enrique Herbert v. The Attorney General,* Action No. 398, at ¶ 21 (Sup.Ct.Belize, 2003)). Herbert characterized his transfer of custody as a "kidnapping and expulsion from Belize," not as an extradition. (*Id.*). Chief Justice Abdulai Conteh of Belize, presiding over that action, found that the actions of the Belizian police violated Herbert's civil rights because the circumstances of Herbert's departure from Belize were "a circumvention" of the extradition treaty. Specifically, he found that the Belizian police "simply handed [Herbert] over" to the DEA "even before the [extradition] warrant had been 'signed or issued.'" (*Id.*). Indeed, "[Before the] formal request could run its course or be brought to fruition, the Commissioner of Police, at the behest or information of agents of the DEA, short-circuited the whole process...." (*Id.* ¶ 38).[2] Moreover, Chief Justice Conteh's account of the events of April 25th and 26th, 2003 is consistent with the facts presented by the litigants here, and was formulated after a hearing in Belize on the issues in which Herbert submitted evidence through affidavits and testimony and was represented by counsel, who cross-examined the adverse witnesses. The weight of the evidence, based on facts in the affidavits of Officers Zetina and Hafiz, as well as the moving papers of both parties, and the opinion of the Supreme Court of Belize, all indicate that Herbert was not transferred to the United States agents pursuant to the extradition treaty. Indeed, as noted above, Herbert argued in Belize—as opposed to his argument here—that he was "kidnapp[ed] and expell[ed]" from Belize and not extradited pursuant to the extradition treaty with the U.S. and Chief Justice Conteh agreed with that argument.

2. *The Mere Existence of an Extradition Request Does Not Prevent Transfer of Custody Outside the Extradition Treaty*

 The extradition treaty between the United States and Belize is not the exclusive method by which the United States can gain custody over a Belizian national. The extradition treaty only serves to "provide[ ] a mechanism which would not otherwise exist, requiring, under certain circumstances, the [signatory countries] to extradite individuals to the other

---

**2.** This, in fuller measure, is what Chief Justice Conteh wrote: "The evidence in this case shows that, even after the formal request had been made for the rendition of Mr. Herbert to the U.S.A. through the formal process and procedure of extradition, and even before the warrant for his arrest for this purpose had been signed or issued, and without the benefit of an appearance in any court of law to challenge the request, he was simply handed over by the Respondent to the agents of the DEA and spirited away." *George Enrique Herbert v. The Attorney General,* Action No. 398, at ¶ 33.

country, and establishes procedures to be followed when the Treaty is invoked." *United States v. Alvarez–Machain,* 504 U.S. at 664–65, 112 S.Ct. 2188. In order for the mechanism for extradition established in the treaty to be the only method by which a person can be transferred from one country to another, the treaty must explicitly state that no other method for transferring custody shall be used. *Id. See also Kasi v. Angelone,* 300 F.3d 487, 499 (4th Cir.2002). Moreover, that express prohibitory term cannot be implied: "[the treaty should not be read] so as to include an implied term prohibiting prosecution where the defendant's presence is obtained by means other than those established by the treaty." *Alvarez–Machain,* at 666, 112 S.Ct. 2188; 71 F.3d 754, 762; *US ex rel. Saroop v. Garcia,* 109 F.3d 165, 168 (3d Cir.1997). *See also United States v. Noriega,* 117 F.3d 1206, 1213 (11th Cir.1997) ("Under Alvarez–Machain, to prevail on an extradition treaty claim, a defendant must demonstrate by reference to the express language of a treaty and/or the established practice thereunder, that the United States affirmatively agreed not to seize foreign nationals from the territory of its treaty partner."). Thus, absent such a specific prohibition, even after the instigation of formal extradition, the U.S. government may act to obtain custody of the defendant through other channels without invoking or violating an extradition treaty. *Kasi v. Angelone,* 300 F.3d at 499. The United States and Belize circumvented the extradition treaty when bringing Herbert to the United States to stand trial on this indictment and that circumvention does not invalidate his indictment.

■ Where the United States gains custody over a foreign national by some method other than extradition, the rule established in *Ker v. Illinois* applies: "The power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdic-

tion by reason of a 'forcible abduction.' " *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952) (citing *Ker v. Illinois,* 119 U.S. 436, 444, 7 S.Ct. 225, 30 L.Ed. 421 (1886)). In *Ker,* the Court held that even where the agent who abducted the defendant in Peru traveled there with an extradition request in his pocket, the existence of the written extradition request did not invoke the extradition treaty. 119 U.S. at 442–43, 7 S.Ct. 225. Notwithstanding the existence of an extradition request, defendant had simply been abducted by the United States. *Id.* Similarly, this Court finds that Herbert was not extradited to the United States pursuant to the United States–Belize extradition treaty, notwithstanding the existence of the April 14 extradition request, and therefore the legality of the method by which Herbert was brought before this Court on the present indictment cannot serve as a challenge to the underlying indictment.

3. *Even if the Treaty Had Been Invoked, Herbert Has No Standing To Object to the Extradition*

■ Herbert asserts that when a person is extradited pursuant to a treaty, and the terms of that treaty are violated, the person cannot be prosecuted in the United States. Herbert fails to recognize the difference between violations of the "rule of speciality," which can be raised by defendants to defeat a court's jurisdiction, and mere procedural violations—such as those alleged in this case—which cannot be raised to defeat an indictment.

The U.S. Court of Appeals for the Second Circuit in *United States v. Reed,* 639 F.2d 896, 902 (2d Cir.1981), held that "absent protest or objection by the offended sovereign, [a defendant] has no standing to raise violation of [an extradition treaty] as an issue." Courts have subsequently

found that in limited circumstances a defendant may have standing to raise violations of an extradition treaty. Those exceptions arise where the extradition has violated the rule of speciality or where the United States government participated in shocking and outrageous conduct in securing the presence of the defendant.

■ The "rule of speciality" requires that a defendant's prosecution be based on the same facts as those set forth in an extradition request. *United States v. Sensi*, 879 F.2d 888, 895–96 (D.C.Cir.1989); *United States v. Rauscher*, 119 U.S. 407, 416–22, 7 S.Ct. 234, 30 L.Ed. 425 (1886). There is a circuit split on whether a defendant has standing to raise a violation of this rule, or whether the rule exists only to protect the sovereignty of the signatory nations and thus can only be raised by those nations. *See United States v. Garrido–Santana*, 360 F.3d 565, 578 & fn. 10 (6th Cir.2004)(collecting cases); *United States v. Nosov*, 153 F.Supp.2d 477, (S.D.N.Y.2001). Some courts have found that a properly extradited defendant who "came to this country clothed in protection . . . the extradition treaty gave him" may have standing to raise the rule of speciality because of that protection. *Ker v. Illinois*, 119 U.S. at 443, 7 S.Ct. 225; *United States v. Martonak*, 187 F.Supp.2d 117 (S.D.N.Y. 2002).

It is not necessary to resolve whether Herbert would or would not have standing to raise a violation of the rule of speciality because no violation of that rule has been alleged. Instead, Herbert alleges that his procedural rights pursuant to the treaty have been violated because "the necessary steps that must be taken," absent a waiver, in order to extradite someone, have not in fact been taken. (Def's Mem. of Law, p. 3). The "rule of speciality" allows a defendant to raise objections to the substantive counts of an indictment that were not disclosed in the extradition request. No such

objections are being raised by Herbert here. The substantive right vindicated by the "rule of speciality" has been contrasted with "procedural violations" of extradition treaties. *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.1986). Courts have consistently refused to allow defendants standing to raise procedural violations to extradition treaties. *Id.; See also United States v. Antonakeas*, 255 F.3d 714 (9th Cir.2001). Because Herbert seeks to raise procedural violations to the extradition treaty which could have been raised by Belize, he has no standing to do so.

■ Another exception to the general rule that a defendant cannot challenge the jurisdiction of a court based on the method by which he was brought before it was established in *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974). In that case, the court exercised its supervisory powers to dismiss an indictment in the face of government conduct of the most shocking and outrageous kind. This case does not involve the type of violent or inhumane treatment of defendant that has led courts in the past to dismiss indictments. In order to invoke *Toscanino*, the defendant must allege a "complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process." *U.S. ex rel. Lujan v. Gengler*, 510 F.2d 62, 66 (2d Cir.1975). Abduction alone is not that sort of "shocking governmental conduct." The court must look to see whether any violent or offensive conduct occurred, such as "torture, brutality and similar outrageous conduct." *Id.* at 65. The alleged deprivation of defendant's rights to formally challenge his extradition are not the type of shocking and outrageous conduct which requires the court to exercise supervisory powers. Additionally, "[e]ssential to a holding that *Toscanino* applies is a finding that the gross mistreatment lead-

ing to the forcible abduction of the defendant was perpetrated by representatives of the United States Government." *United States v. Lira,* 515 F.2d 68, 70 (2d Cir. 1975). Here, any "mistreatment" was effectuated by representatives of Belize, not the U.S. agents.

Herbert attempts to establish his standing to challenge the extradition based on language that appears in *United States v. Alvarez–Machain* that treaties are all "self-executing" and that therefore a court must enforce a treaty "on behalf of an individual regardless of the offensiveness of the practice of one nation to the other nation." 504 U.S. at 667, 112 S.Ct. 2188. This language, appearing in dicta in *Alvarez–Machain,* and couched in hypothetical language, has not led other courts to find that defendants have standing to raise an objection to an extradition outside the rule of speciality. Subsequent courts addressing the issue of whether a defendant has standing to challenge an indictment based on imperfect extradition have specifically found that phrase to be insignificant. *See e.g., United States v. Matta–Ballesteros,* 71 F.3d 754, 762 (9th Cir.1995) ("[I]n the absence of express prohibitory terms [specifiying extradition as the only method one signatory country can gain jurisdiction over nationals of another] a treaty's self-executing nature is illusory.").

*B. Herbert's Statements Made on April 29, 2002 Were Voluntary and Are Admissible in this Proceeding*

 A statement made by a defendant to foreign police in the absence of *Miranda* warnings is only admissible against that defendant in a prosecution in the United States if the statement was made voluntarily. *United States v. Yousef,* 327 F.3d 56, 145 (2d Cir.2003) (collecting cases). In order to determine whether a statement was voluntary when made, the Court applies a "totality of the circumstances" test that includes an examination of "the characteristics of the accused, the conditions of the interrogation, and the conduct of the law enforcement officials." *United States v. Yousef,* 327 F.3d at 56; *see also United States v. Welch,* 455 F.2d 211 (1972). In evaluating the "totality of the circumstances," a court should examine, among other matters, the conduct of law enforcement officers, the length of the interrogation and detention, and whether any physical or psychological coercion took place. *United States v. Yousef,* 925 F.Supp. 1063, 1075–76 (S.D.N.Y.1996).

According to the government, the 2002 Belizian police report, which contains several potentially incriminating statements by Herbert regarding his involvement in the drug trade, is a voluntary statement Herbert made in reporting his own kidnapping the day that Herbert appeared at the Racoon Street Station as a complainant.

Herbert's challenge to the Belizian government's account of the interview is to claim that Assistant Superintendent Myvette's testimony should not be believed because it is "incredible" that Herbert would go to a Belizian police station and incriminate himself voluntarily, much less do so and then leave the police station without being arrested. (Trans. 36:17–21, Santangelo letter, dated Feb. 3, 2003, p. 3).

However, Myvette's testimony was credible and Myvette explained why Herbert incriminated himself at the police station: a person cannot be arrested in Belize for drug crimes based solely on his own testimony, but rather must be apprehended with actual contraband. (Trans.33:21–24). This aspect of Belizian law lends credibility to Myvette's statements that Herbert

make incriminating statements voluntarily, because if he was not in possession of contraband at the time when he made the statements, he apparently was not vulnerable to criminal sanctions. Additionally, Herbert has not alleged any physical or psychological coercion in his affidavit and the police questioning lasted less than two hours. (Herbert Aff.).

The Court also credits Myvette's testimony that the police station was an administrative center and that no one was armed in the room where the questioning of Herbert took place. (Trans. 19:13–20:17; 21:1–26:8; 22:5–17). In light of these facts, there is no reason to think that Herbert did not volunteer the information contained in his statement, and the government has met its burden of proving by a preponderance of the evidence, and considering the totality of the circumstances, that Herbert's statements were made voluntarily. *See United States v. Diaz*, 891 F.2d 1057, 1060 (2d Cir.1989) (citing *Lego v. Twomey*, 404 U.S. 477, 482–89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)).

## III. Conclusion

For the reasons set forth above, Herbert's motion to dismiss the indictment and to exclude incriminating statements from the evidence offered at trial is denied.