**UNITED STATES of America,**

v.

**John T. SACCO, Richard S. Sacco, Defendants.**

**No. 91–CR–241A.**

United States District Court, W.D. New York.

Jan. 27, 1995.

Patrick H. NeMoyer, U.S. Atty. (Richard P. Maigret, of Counsel), Buffalo, NY, for the Government.

Norman P. Effman, Buffalo, NY, for defendant John T. Sacco.

James P. Harrington, Buffalo, NY, for defendant Richard S. Sacco.

## DECISION AND ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on February 5, 1992. On May 18, 1992, defendant John T. Sacco filed a motion to suppress certain statements that he made to government agents on February 8 and 9, 1990. On September 13, 1994, Magistrate Judge Foschio filed a Report and Recommendation recommending that defendant John T. Sacco's motion to suppress be denied.

Objections to the Magistrate Judge's Report and Recommendation were filed by defendant John T. Sacco on October 7, 1994. The government filed a response to defendant's objections on December 12, 1994.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made.

Upon a *de novo* review of the Report and Recommendation and the record, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, defendant's motion to suppress is denied.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This matter was referred to the undersigned by the Hon. Richard J. Arcara on February 5, 1992 for report and recommendation on any dispositive motions. The matter is presently before the court on the motions of Defendants John T. Sacco and Richard S. Sacco to suppress evidence, dated May 18, 1992 and February 24, 1992, respectively.

### *BACKGROUND*

John T. Sacco and Richard S. Sacco, along with eleven other co-defendants, were indicted in a twenty-one count indictment, dated October 15, 1991, charging violations of 21 U.S.C. § 841, 21 U.S.C. § 846, 21 U.S.C. § 848, 21 U.S.C. § 853, 21 U.S.C. § 856, 18 U.S.C. § 1623 and 18 U.S.C. § 2. Specifically, Defendants are charged with conspiracy to distribute marijuana and possession with intent to distribute marijuana. There are additional counts against certain defendants for owning real property and making such property available for the purposes of storing and distributing marijuana, for making false statements to the grand jury, and two criminal forfeiture counts.

Motions to suppress on behalf of co-defendants Glenn E. Wolffe and Joseph R. Orcutt, dated April 20, 1992 and April 9, 1992, were denied, following an evidentiary hearing, upon the Report and Recommendation of this court dated February 4, 1994, by Hon. Richard J. Arcara in a Decision and Order filed May 5, 1994.

A motion for pretrial discovery, including particularization, filed by all co-defendants was denied by a Decision and Order of this court dated May 5, 1992. A motion by co-defendant Zander, to dismiss the Indictment was denied by Decision and Order of Hon. Richard J. Arcara on September 7, 1994 upon this court's Report and Recommendation dated May 7, 1992. On July 28, 1992, this court denied motion for severance on behalf on co-defendants Santa Maria, Holland and Poulous.

John T. Sacco's motion seeks to suppress statements made by him to agents of the Federal Bureau of Investigation (FBI) during a late evening conversation on February 8, 1990 and extending into the early morning of February 9, 1990. Richard S. Sacco seeks to suppress statements made by him to FBI agents in meetings conducted March 27, 1990, May 11, 1990 and May 17, 1990. The Government's response to the Defendants' motion was filed June 11, 1992 and an extended evidentiary hearing was conducted on December 1, 1992, March 2, 1993 (two volumes), April 19, 1993, April 26, 1993, May 6, 1993, May 11, 1993, May 18, 1993, June 3, 1993 and June 25, 1993.[1] The Government called eight witnesses and both Defendants testified. Government Exhibits 1 through 15, and Defendants' Exhibits 1 and 2 were admitted into evidence. A brief on behalf of

---

1. T.I references are to the page number of the transcript of the evidentiary hearing held on December 1, 1992; T.IIa references are to the page number of the transcript of the evidentiary hearing held March 2, 1993 (Volume 1 pp. 3–99); T.IIb references are to the page number of the transcript of the evidentiary hearing held on March 2, 1993 (Volume 2 pp. 2–130); T.III references are to the page number of the transcript of the evidentiary hearing held on April 19, 1993; T.IV references are to the page number of the transcript of the evidentiary hearing held on April 26, 1993; T.V references are to the page number of the transcript of the evidentiary hearing held on May 6, 1993; T.VI references are to the page number of the transcript of the evidentiary hearing held on May 12, 1993; T.VII references are to the page number of the transcript of the evidentiary hearing held on May 18, 1993; T.VIII references are to the page number of the transcript of the evidentiary hearing held on June 3, 1993; and T.IX references are to the page number of the transcript of the evidentiary hearing held on June 25, 1993.

John T. Sacco was filed November 3, 1993; the Government's brief in opposition was filed December 27, 1993. Oral argument was held on January 6, 1994 at which time counsel to Richard S. Sacco advised the court that he had not filed a memorandum in support of Sacco's motion as he had concluded that the position taken by his client, Richard S. Sacco, could not be supported based on the record of the evidentiary hearing. However, he joined in the argument put forth by counsel to John T. Sacco.[2] For the reasons which follow, Defendants' motions to suppress should be DENIED.

### FACTS

On February 28, 1987, United States Border Patrol Agents stopped and searched a motor home traveling on an interstate highway near Las Cruces, New Mexico. As a result of the stop and search of the vehicle, a briefcase containing a small bag of marijuana and a brown leather suitcase containing $125 thousand in currency and a handwritten note were seized. The driver of the motor home was Glenn Wolffe and his passenger was Joseph Orcutt, co-defendants in this case. *See United States v. Wolffe and Orcutt,* 91–CR–241A Report and Recommendation dated February 4, 1994 at pp. 3, 7–9. Both the motor home and currency were thereafter subject to a civil forfeiture action by the Government, however, the case was settled and the motor home and a portion of the currency were returned to Wolffe in December, 1987. *See* Report and Recommendation, *supra,* at 11.

On July 22, 1989, at approximately 10:00 p.m., a team of FBI agents, led by Special Agent J. Ronnie Webb, then in charge of the Organized Crime Unit of the local FBI office, executed a search warrant for the residence and person of John C. Sacco at 278 Commonwealth Avenue in the City of Buffalo. (T.VIII.5,9,12; T.IX.3). Sacco was a reputed member of local organized crime in the Buffalo area, the father of John T. Sacco and brother of Richard S. Sacco. (T.I.6,56; T.VIII.22). Sacco had served eighteen years

in prison on state and federal charges (T.VIII.56), and while incarcerated had refused to discuss with the FBI opportunities for release in return for cooperation with the Government. (T.VIII.56, T.IX.113). The search warrant was based on prior electronic surveillance at Sacco's residence, and authorized the seizure of controlled substances and proceeds of drug trafficking. (T.VIII.6,15,-39,44). The resulting search did not yield any narcotics, but some money proceeds of Sacco's loansharking operation were discovered, which Sacco was allowed to retain. (T.VIII.44). Upon his arrival at Sacco's residence, Special Agent Webb engaged Sacco in a lengthy conversation which extended into the early morning hours of July 23, 1989. (T.VIII.9). In that conversation, Agent Webb told Sacco about the information available to the FBI which established his involvement in various crimes, and the involvement on his son, John T. Sacco, as a leader in a Mexico–United States marijuana smuggling conspiracy, then ongoing, and in which John C. Sacco was also involved as both a supplier of capital and advice to his son, John T. Sacco, as well as a distributor of the marijuana. (T.VIII.44,51–53). The FBI also indicated it was aware that John T. Sacco's home was probably purchased with drug proceeds. (T.VIII.44).

The purpose of the conversation was to attempt to obtain John C. Sacco's cooperation in acting as a cooperating witness and assist the FBI in investigating organized crime activities in the Buffalo area. (T.VIII.10). Although Agent Webb, at that point, did not, in fact, believe he had sufficient evidence to obtain an indictment against John T. Sacco, he, nevertheless, stated to John C. Sacco that such an indictment could be obtained. (T.VIII.63,66–69). The FBI, however, expected to obtain the necessary evidence at a later time. (T.VIII.73). Sacco was advised about the FBI investigation as to his son to encourage him to agree to cooperate with the FBI. (T.VIII.73,89). At that time, the FBI had no search or arrest warrants for John T. Sacco or his uncle, Richard. (T.VIII.7, T.IX.4). Agent

---

**2.** The court construes the representation of counsel to Richard S. Sacco as equivalent of a withdrawal of his motion; nevertheless, the court will, in the interest of completeness, address the merits of Richard S. Sacco's motion.

Webb's objective was to first obtain John C. Sacco's cooperation in the organized crime phase of the investigation and, when that phase was completed and prior to the fact of Sacco's cooperation becoming public, to obtain Sacco's assistance in persuading his son to also cooperate with the Government. (T.VIII.18,99–100). Within the first hour of the conversation, Sacco, who was then on parole, agreed to cooperate. (T.VIII.58).

No explicit promises to John C. Sacco were made at that point as to any favorable treatment he might receive regarding a possible reduced plea, sentencing and similar considerations, rather Agent Webb specifically advised him that such agreements would have to be separately negotiated with the United States Attorney. (T.VIII.8,11). No promises as to possible favorable treatment for his son or brother were then made to Sacco. (T.VIII.8). Webb was confident that, as the on-scene commander, he would have known if any of the other agents on the premises had attempted to make different statements to Sacco regarding the probable outcome of his cooperation and would have prevented this from occurring. (T.VIII.12,31). Administrative penalties would apply to any agents who attempt to make such arrangements without the approval of the United States Attorney. (T.VIII.12).

As the evidence outlined by Webb showed that the Government's cases against Sacco and his son were connected, Sacco expressed concern about his son and was advised by Webb that if his cooperation was satisfactory to the Government, his son could, after Sacco's identity as a government cooperating witness became public, approach the FBI and negotiate a "deal" as to his involvement in the Mexico–United States marijuana distribution operation, about which the FBI wanted further details. (T.VIII.18). Sacco was therefore advised that there would be no promises or commitments regarding possible favorable treatment of his son as it made no sense for the Government to relinquish its leverage on obtaining Sacco's cooperation in the organized crime phase of the investigation by then bargaining away its power to prosecute his son for his involvement in the marijuana smuggling operation. (T.VIII.18).

Accordingly, no promises to Sacco regarding consideration for his son were made at that time. (T.VIII.18).

Following the initial discussion as to his becoming a cooperating witness on July 2, 1989, Sacco was given a proposed standard FBI cooperating witness agreement for execution, Government Exhibit 14, which Sacco retained for several months without signing. (T.VIII.20). The agreement was not executed by Sacco until February 5, 1990 and by G. Robert Langford, Special Agent in Charge of the FBI for the Buffalo area, on February 12, 1990. During the initial period of his work as a cooperating witness, Sacco, who had been paid $3,000 per month by the FBI for his services (T.VII.226), repeatedly demanded that the agreement refer to favorable consideration for his son in return for Sacco's cooperation, however, this was consistently rejected by the FBI. (T.VIII.21). Up to the point when the agreement was signed, Sacco's usefulness to the FBI was minimal. (T.VII.227). Neither at the time of the July 22 meeting nor during the intervening months leading to the execution of the agreement, did Sacco ever mention in his conversation any request for favorable treatment regarding his brother, Richard S. Sacco. (T.VIII.25–26, T.IX.4). Prior to receiving the proposed cooperating witness agreement in September, 1989, Sacco was given offers of immunity from the United States Attorney and the Erie County District Attorney by letters dated July 28 and August 1, 1989, respectively. *See* Defense Exhibits 1 and 2. Except for the United States Attorney, District Attorney and members of the FBI organized crime unit, no one else was informed of Sacco's cooperation as it would have created serious risks of danger to him. Sacco was, therefore, admonished not to advise his son or relatives of his cooperation. (T.VIII.23,24–25).

After his July 22, 1989 discussions with the FBI and despite the fact that he had not yet executed a cooperating witness agreement, Sacco participated in debriefing sessions with the FBI regarding his activities and information he might possess regarding organized crime activity in the Buffalo area, and discussed wearing a recording device. (T.VII.

126–131,140,143). However, during that time Sacco did not provide the degree of cooperation and assistance that, in Agent Webb's judgment, Sacco was capable of causing Webb to consider requesting a formal prosecution be commenced against Sacco. (T.VIII.63). Sacco was further told that if he did not live up to his commitment to cooperate, his son would be indicted, although, as noted, the FBI at this point lacked sufficient evidence to bring such a case against the son. (T.VIII.63). In several conversations with Webb, Sacco demanded considerations for his son be added to the proposed agreement; however, this proposal was rejected by Webb who again advised Sacco that at the end of the investigation his son would have to meet with the FBI to negotiate his own deal. (T.VIII.85). Sacco also brought up this subject in several other conversations with other agents assigned to work with him during the debriefing period, but Sacco's assertions of immunity for his son based upon Sacco's cooperation were also rebutted by these agents. (T.VII.201,187,192). The problem of Sacco's lack of productivity as a cooperating witness continued into December, 1990, at which point, Special Agent Webb was transferred. (T.VIII.13,63).

Following an inadvertent discovery of Sacco's status as a cooperating witness, the FBI and Sacco decided to contact his son for the purpose of advising him of his father's cooperation and to suggest that he accept protective custody for himself and his family as well as consider cooperating with the Government. (T.I.7, T.III.150). At the direction of the FBI, Sacco telephoned his son eventually contacting him at about 10 p.m., the evening of February 8, 1990. (T.III.135). The purpose of the phone call was to request that his son meet him to discuss a matter of importance and, to preserve security for both of them, the FBI suggested meeting in a public place. (T.I.13). A parking lot on Transit Road near John T. Sacco's home was suggested. (T.I.13, T.III.137).

Sacco arrived in his vehicle at the parking lot at approximately 11 p.m. (T.I.12–13) which was selected for safety considerations and because it was in the vicinity of his home. (T.I.13,122). John C. Sacco arrived with Agent McLane in his own automobile. (T.I.117). Two other FBI agents, Thurston and Watts, arrived in an unmarked car. (T.I.117). All agents were dressed in casual attire. (T.I.117). John C. Sacco approached his son's vehicle with Agent McLane and spoke to him through the driver's side window stating "I'm with them now," meaning that he was cooperating with the FBI. (T.I.124). He also told his son that the FBI had a solid case against both himself and his son (T.I.124) and that they should sit down with the FBI agents and hear them out. (T.I.15,-124,127). After this preliminary conversation, Agents Thurston and Watts, McLane and John C. Sacco, formed a huddle near John T. Sacco's vehicle, so as to overhear the conversation. (T.I.124). No identification was shown to John T. Sacco at that time, the agents relying on John C. Sacco to persuade his son that they were in fact FBI agents. (T.I.123). After about a thirty minute conversation, someone suggested that they proceed to a nearby all-night restaurant. (T.I. 122, 123,128). John T. Sacco then left his vehicle, was briefly patted down by Agent Thurston (T.IIB.24), and drove with Agents Thurston and Webb to the restaurant, arriving a few minutes later. (T.I.24). John C. Sacco followed in his vehicle with Agent McLane. (T.I.23). At no time while in the parking lot was John T. Sacco under arrest, in custody or not free to leave if he had chosen to. (T.I.19,21–22, T.III.3,9,11).

At the restaurant, which was uncrowded at that hour, the party sat at a table and, except for John T. Sacco, ordered coffee. (T.I.24, T.III.144). Agent Thurston showed Sacco his identification as an FBI agent (T.IIa.64), although Sacco by then accepted his father's statement that the others were FBI agents. (T.III.148, T.IV.4–5). John T. Sacco sat at one end of the table, Agent McLane on one side of the table and his father on the other. Agent Thurston sat at the opposite end of the table with Agent Webb between he and Agent McLane. (T.VIII.186). John C. Sacco then explained to his son that he had decided to cooperate with the FBI because they had a solid case against both him and his son as well as Richard Sacco. (T.I.26). Agent McLane told John T. Sacco that he believed the father's cooperation was expect-

ed to soon become public knowledge which disclosure could present a danger to him, and Sacco agreed with this opinion. (T.I.27). The agents then proposed that Sacco and his family join his father in protective custody to be provided by the Government and allow them to be relocated and become part of the Government's witness security program. (T.I.27–28). Sacco indicated that this protection would be of interest but that he needed more information, and would make a decision following his return from a previously scheduled business trip. (T.I.28–29).

Agent McLane then discussed the fact that Sacco was the target of an FBI investigation concerning marijuana trafficking, based on the stop of the motor home in New Mexico, driven by co-defendants Wolffe and Orcutt, in 1987. (T.I.31–32, T.IIa.73). The conversation, which was not in question and answer form, consisted of a narrative by Agent McLane to which Sacco responded. (T.I.38). In response to McLane's recounting of Sacco's criminal activities, McLane testified that Sacco stated that he knew he had been under investigation and acknowledged the motor home and the items seized were his. (T.I.34). According to McLane, Sacco also volunteered the names of co-defendants Wolffe and Orcutt without McLane first mentioning them in his narrative as to the 1987 stop of the motor home. (T.I.35). Sacco also said that he was surprised that the Government returned to him the $125 thousand which had been seized from the motor home, as it was proceeds of a drug transaction. (T.I.35). This was the first time the fact that the money had been returned had come to McLane's attention. (T.I.35).

According to McLane, Sacco also stated that he knew the motor home stop would "come back to haunt" him (T.I.36), and that the money was intended to be delivered to Vincent Gonzalez who was John T. Sacco's supplier of marijuana in the drug trafficking operation. (T.I.37,39). Sacco described other contacts with the Gonzalez marijuana ring and how he was introduced to Gonzalez. (T.I.39–40). Sacco acknowledged that his firewood business was used to mask the transportation of the illegal marijuana. (T.I.41–42). The purpose of this part of the conversation was to obtain Sacco's cooperation with the Government. (T.I.46–48). Sacco, who was free to leave the meeting at any time (T.I.31), acknowledged McLane's description of his criminal activity (T.III.17).

Obtaining John T. Sacco's cooperation was a secondary purpose of the discussion, (T.I.48), the primary purpose being to obtain his cooperation in accepting protection, as the FBI believed that Sacco, being his father's drug supplier, was in danger as a result of a probable disclosure that the father was a cooperating witness. (T.I.50–51). The conversation lasted until approximately 1:00–1:30 a.m. the next day. (T.I.53). Sacco agreed to consider the offer of relocation and protection and, as it was expected that the knowledge of his father's cooperation would become public within four to five days (T.I.55), that Sacco should communicate his decision to the FBI as soon as possible. (T.I.55–56). The FBI indicated that it also intended to contact Richard S. Sacco, to alert him to the potential danger and offer similar protection and possible relocation. (T.I.55). It was agreed that the FBI would meet with John T. Sacco at his home on February 17, 1990 to receive his decision. (T.I.57–58). Following the meeting at the restaurant, Sacco was driven back to his car at the parking lot, and John C. Sacco was then driven to a secure location by Agents Thurston and Watts. (T.I.53–54).

At no time during the conversation in the parking lot or at the restaurant did John C. Sacco attempt to interrupt Agent McLane as he explained the FBI's investigation against his son, nor did he loudly state that McLane could not talk about possible cooperation with the FBI because his son was covered by his deal with the FBI and, therefore, did not have to cooperate. (T.IX.8). Further, Agent McLane never asked John T. Sacco to inform his uncle, Richard Sacco, that he had nothing to worry about as he also would not be prosecuted because of his brother's cooperation with the FBI. (T.IX.9). While during the meeting at the restaurant John C. Sacco was agitated because he had been taken off the street based on the discovery of his status as a cooperating witness, the only interruption in Agent McLane's conversation

with his son was his objection to any FBI effort to prevent his son from taking his scheduled business trip to France. (T.IX. 292,293).

At a subsequent meeting with John T. Sacco at his home, which lasted approximately one hour (T.I.58), the witness security program, but not cooperation, was discussed by the FBI. (T.I.59). Sacco's effort to raise the question of possible immunity based on his father's cooperation was rejected by the agents. (T.IX.36–38). At the meeting at John T. Sacco's residence on February 10, there were, however, no promises made to Sacco or to any other persons regarding the criminal investigation of him. (T.I.270). About a week later, Sacco and his sister visited their father at a Rochester hospital. (T.III.176). While they were together, John C. Sacco told his son that the deal with the FBI which also covered him was contained in a document he had signed with the FBI, and that Agent McLane should provide a copy of it for him. (T.III.181). On other occasions following the initial contact with Sacco on February 8, 1990, Sacco mentioned possible plea terms of five years and forfeiture of certain real and personal property. (T.I. 239). Agent McLane told Sacco he would transmit that proposal to the U.S. Attorney. (T.I.239). In none of the FBI's discussions with John T. Sacco was he given any *Miranda* warnings. (T.I.83).

In March, 1990, Matthew J. Murphy, III, Esq. was retained by John C. Sacco to represent him in negotiating a formal plea bargain agreement based upon his cooperation with the Government. (T.V.8). Prior to meeting with Sacco, Murphy was told by Agent Thurston that there was no way to know what may have been promised to Sacco by Agent Webb to persuade Sacco to cooperate. (T.V.10). Sacco stated to Murphy that the FBI told him that, when his house was searched in July, 1989, if he cooperated, the investigation against his son would stop immediately, and that his son and brother would not be prosecuted. (T.V.14). However, Murphy acknowledged that there were no written agreements to this effect. (T.V.15). Murphy's outline of negotiating points on the proposed plea agreement for Sacco contains

a notation that this request had been rejected. *See* Government Exhibit 13. When Murphy told the FBI that Sacco believed his agreement included immunity for his son and his brother the FBI agents countered that while they desired to make a deal with Sacco's son, there was no promise of a "free ride." (T.V.18). Murphy understood the arrangement to be that if John C. Sacco cooperated, he would not be prosecuted. (T.V.19–20).

Another FBI agent, Dean Naum, who was then providing security for John C. Sacco at the safe house in Chautauqua County (T.V.29), told Murphy that Agent Webb probably gave John C. Sacco the option of being FBI director or president of the United States in order to gain his cooperation. (T.V.31). Although Murphy explicitly attempted to negotiate a formal plea agreement on behalf of Sacco, no provisions granting immunity from prosecution for the benefit on his son and brother were included in the final negotiated agreement. (T.V.35). The final proposed agreement for Sacco included expected pleas to a federal narcotics violation with a recommendation for probation as well as forfeiture of certain real property. (T.V.36–37). As issues arose regarding Sacco's lack of truthfulness with the FBI, the agreement was not consummated, and Sacco was subsequently arrested and charged in a federal complaint in June, 1990. (T.V.39–40). Murphy terminated his representation after Sacco's initial appearance in late June, 1990. (T.V.42).

Sacco's efforts to enforce the non-executed agreement were pursued on his own behalf in this court, however, the prosecution terminated upon Sacco's death in December, 1990. (T.III.188, T.V.43). Murphy never discussed with John T. Sacco or Richard Sacco that, based on John C. Sacco's cooperation, they would not be prosecuted. (T.V.99). Neither John T. Sacco nor Richard Sacco ever told Murphy that they believed they had immunity from prosecution based on John C. Sacco's cooperation. (T.V.103–104). Both Agents Naum and Thurston testified that their statements to Murphy about what Webb may have said to John C. Sacco to gain his cooperation were meant to be "sarcastic" as they

had had disagreements with Webb about the conduct of the Sacco investigation. (T.VII. 120–121,195).

While being held, from February, 1990 through his arrest in June, 1990, in protective custody, Sacco repeatedly insisted that his deal with the FBI included immunity for his son, but the agents assigned to protect him told him directly this was not the case, as such an understanding would be contrary to standard FBI operating practices. (T.VII. 115–119). Sacco himself was considered to be a "conniver" and "manipulator" who often would take positions even though he knew they were not true, and his credibility was, in the judgment of the FBI, minimal, however, his testimony could have nevertheless been useful as the FBI had corroborating evidence. (T.VII.170–172,203).

John T. Sacco testified that during his meeting with the FBI at the restaurant on the night of February 8, 1990, his father told Agent McLane to describe the FBI's case against him. (T.III.152). However, according to Sacco, his father also told him that he was covered under his deal with the FBI. (T.III.157). Sacco assumed, because the agents present did not, at that time, directly contradict his father's statement that he had no reason to worry about any criminal prosecution as to himself, although he acknowledged that none of the FBI agents specifically said this was the case. (T.III.157).

Sacco also testified that Agent McLane explained the details of the Government's witness protection program (T.III.163), and that McLane advised both him and his sister, the next day, about the FBI's concerns for their safety because of possible retaliation against them based on their father's cooperation. (T.III.172). Sacco also acknowledged that he received major supplies of marijuana from a source in Arizona. (T.IV.47). Sacco had no explanation as to why his father would, as he testified, have reason to become upset with Agent McLane's discussion with him at the restaurant on February 8, 1990, if he had in fact obtained immunity for him. (T.IV.125). However, Sacco insisted that while his father sat in his car at the parking lot when they first met on the evening of February 8, 1990, his father told him that

based on his cooperation with the FBI, he had a "jail free card" which, according to Sacco, the father repeated three to four times during the conversation while they were at the restaurant. (T.III.187).

Following the meeting at the restaurant on February 8, 1990, the next day Agents McLane and Corcoran visited Richard Sacco at his place of business and advised him that his brother had been cooperating with the FBI and was in protective custody. (T.I.60). Although Richard Sacco expressed disbelief, the FBI offered him protection, which he rejected. (T.I.61). Several days later on February 13, 1990, Richard Sacco contacted the FBI by telephone (T.I.62) to say that he had become convinced that his brother had in fact cooperated with the government. (T.I.62). Agent McLane proposed that they meet that day at a public restaurant and Richard Sacco suggested a restaurant near the airport in the Town of Cheektowaga. (T.I.63). Richard Sacco drove himself to the restaurant and met with Agent McLane. (T.III.123).

Sacco discussed with McLane both the danger to himself as a result of his brother's cooperation and his involvement in the marijuana trafficking operation with his nephew, John T. Sacco. (T.I.64–65). During that conversation, Sacco admitted that he had driven to Arizona on more than one occasion to pick up a rental truck loaded with marijuana and drive it back to Western New York. (T.I.63,66). Sacco indicated that he knew the marijuana was supplied by the Gonzalez drug organization and gave information regarding other individuals involved in the marijuana trafficking operation. (T.I.66–68). Sacco was not in custody or under arrest, and he was free to leave at all times during the meeting. (T.I.68). If Sacco had requested to leave the meeting at the restaurant he would have been permitted to do so. (T.I.69). No promises were made to Sacco at that time. (T.I.62). Sacco initially agreed that he would cooperate with the Government based on his involvement in the marijuana distribution scheme. (T.I.71). Although Sacco requested concessions on the part of the Government at that time, Agent McLane stated he was unable to make any

such representations but would, in anticipation of his actual cooperation, agree to make such cooperation known to the court and to the United States Attorney. (T.I.72). Sacco advised that he had scheduled a meeting with an attorney. (T.I.70). At no time during the meeting did he request an opportunity to speak with an attorney. (T.I.73). In fact, Sacco never consulted with an attorney about the matter. (T.VII.51).

At a subsequent meeting with Richard Sacco on March 1, 1990, Agent McLane was accompanied by Border Patrol Agent Robert Scofield. (T.I.76,77). Agent McLane had contacted Richard Sacco and asked if he would attend the meeting and Sacco agreed to do so at the same restaurant. (T.I.78). During the meeting Sacco was not under arrest or prevented from leaving at his option. (T.I.81). During a conversation with Agent Scofield, Sacco revealed detailed information concerning his involvement with the Gonzalez marijuana trafficking business. (T.I.81–82). Despite further contacts with Richard Sacco in which he indicated a willingness to cooperate with the Government, no agreement was ever consummated. (T.I.90–91). Moreover, Sacco never fully cooperated with the Government other than making the statements regarding his involvement with the marijuana trafficking operation to the agents. (T.I.91). At no time during any of the FBI's meetings with Richard Sacco was he given *Miranda* warnings. (T.I.83).

As a result of a meeting, held, on March 16, 1990, at another local restaurant, with FBI Agent Eric Kruss and Assistant United States Attorney Anthony Bruce, a letter was prepared for Sacco signed by the United States Attorney advising that, as a condition to any cooperation, Sacco would first have to plead guilty to a felony narcotics violation and that his cooperation, if substantial and complete, would prompt the Government to recommend that Sacco receive probation. (T.I.222–223). *See* Government's Exhibit 6. The letter was delivered to Sacco on May 17, 1990 by Agent Kruss. (T.IIB.104). The agents again met with Sacco in May, 1990 (T.I.95), and Sacco stated he was still undecided on whether he was interested in coop-

erating with the Government despite the fact that his brother's cooperation had then become a matter of public knowledge. (T.I.96). In a final effort to learn whether Sacco would be willing to cooperate, a meeting was held with him at his home on May 25, 1990 by Agents McLane, Kruss and Watts. (T.I.226). Sacco was reminded that any bargain or deal he would strike with the United States Attorney would be independent of any arrangement that his brother had with the Government. (T.I.234).

Richard S. Sacco testified that he met voluntarily with FBI agents on February 13, 1990, and provided self-incriminating information to them. (T.VI.123). This occurred after the agents contacted him on February 9, 1990 to advise that his brother, John C. Sacco, had been cooperating with the FBI and that, as a result, he may be a target of retaliation by members of the local organized crime community (T.VII.71), and after a telephone call with his nephew, John T. Sacco, who confirmed his father's cooperation. (T.VI.76). Sacco also asserted that his nephew told him that John C. Sacco's cooperation had gained a "freebie" for them, meaning that they would not be prosecuted for their respective criminal activity, particularly with reference to the Arizona marijuana distribution operation. (T.VI.76,83, T.VII.10,14,36). However, Sacco could not explain why, if he believed he had acquired such immunity, he was concerned as to whom the FBI asked him to testify against. (T.VI.87). Sacco confirmed that he had met with the FBI on several occasions thereafter, and provided information, all on a voluntary basis (T.VI.80,81,85 and T.VII.60), including one meeting with an assistant United States Attorney to discuss possible terms of a specific cooperating and plea agreement on March 16, 1990. (T.VII.15,18,22–26). (*See* Government Exhibits 2–11). Sacco agreed that this was the first time he had any discussion as to specific promises or offers of leniency with the Government. (T.VII.29–30). Sacco testified that he had one thirty-second telephone conversation, on either February 16 or 17, 1990, with John C. Sacco in which his brother told him he had gotten the "freebie" for him and John T. Sacco, his son. (T.VI.110).

Sacco also testified that he again spoke with his brother after May 17, 1990 and that his brother told him that as part of their deal with the FBI, he could continue talking with the FBI. (T.VII.70–72). Sacco further testified that his brother was notoriously untrustworthy and that anything his brother said "went in one ear and out the other because [he] never believed half of it anyway." (T.VI.100). Sacco admitted that he failed to determine the exact terms of the deal his brother had struck with the FBI, and that he took the risk of talking with the FBI without first obtaining such important specifics. (T.VII.104). Prior to the investigation, Sacco had served as a City of Buffalo police officer for eighteen years before retiring, and was familiar with criminal investigations including the fact that he was not required to incriminate himself. (T.VI.144, VII.14,45–46).

## DISCUSSION

Defendant, John T. Sacco, presents two arguments in support of his motion to suppress. First, Sacco asserts that regardless of whether he made incriminating statements to the FBI during his late evening meeting with the agents and his father on February 8, 1990 at the restaurant, the statements were induced by a direct or implied promise of immunity from prosecution made to him by his father, John C. Sacco, who was at the time a paid Government cooperating witness, and as a product of coercion, are therefore involuntary and inadmissible. See Defendant's Brief in Support of Motion to Suppress filed November 3, 1993 at pp. 22, 27. Second, Sacco contends that, even if there was no agreement between the Government and his father based on his father's willingness to cooperate with the Government and providing for immunity from prosecution for Sacco and his uncle, Richard S. Sacco, relating to their involvement in the marijuana trafficking operation, when John C. Sacco made statements causing him to believe that he was immune from prosecution, the failure

of the FBI agents present, to contradict such assertions of immunity constitutes deception and violates due process. See Defendant's Brief in Support of Motion to Suppress at p. 28.

As Sacco does not contend that he was in custody at the time of the encounter at either the parking lot or during the meeting at the restaurant, the fact that he was not provided any Miranda warnings during his meeting with the FBI is not dispositive of the issue presented on the motion. In the absence of an issue under the 5th Amendment's self incrimination clause or the 6th Amendment[3], the admissibility of Sacco's statements turns on whether they were voluntary or the product of government deception in violation of due process.

■ As Sacco has not moved to dismiss the Indictment, it is evident that his motion is not premised on there being a specific agreement between himself and the Government granting him immunity. See United States v. Cahill, 920 F.2d 421, 425–26 (7th Cir.1990), cert. denied, 500 U.S. 934, 111 S.Ct. 2058, 114 L.Ed.2d 463 (1991) (prosecution of a defendant based upon testimony taken after a specific promise of immunity warrants dismissal) (citing cases). However, a promise not to prosecute made by someone other than a United States Attorney cannot bind the government. See United States v. Streebing, 987 F.2d 368, 372 (6th Cir.), cert. denied, ― U.S. ―, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993); United States v. Serlin, 538 F.2d 737, 749 (7th Cir.1976) (statements by prosecutors that immunity was a possibility based on cooperation did not constitute impermissible inducement to confess). Assuming that Sacco's father made the promise that the father's cooperation agreement conferred immunity on him, Sacco must also establish that his father was authorized by the United States Attorney to make such a promise and that he relied upon the promise

---

**3.** Sacco's reliance on Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) does not raise a claim of interference with the 6th Amendment right to counsel, rather Sacco asserts that Massiah supports his argument that as an FBI cooperating witness his father's false statements of immunity resulting in an in-

criminating statement violated Sacco's due process rights. See Defendant's Brief in Support of Motion at p. 24. However, his father's status as a cooperating witness was disclosed to him and he was aware the FBI agents were there to obtain his cooperation as well as offer protection. Massiah is, therefore, inapposite.

to his detriment. *See Streebing, supra.* If Sacco's statements to the FBI on February 8–9, 1990 were induced by the Government's promise of immunity, they were involuntary and must be suppressed. *See Cahill, supra,* at 427. However, Sacco has failed to show his father's claimed assertions of his immunity were authorized by the FBI or United States Attorney.

Here, as discussed in greater detail *infra,* the court finds that there was no agreement between the Government and John C. Sacco conferring, upon his son John T. Sacco, the Defendant, any immunity from criminal prosecution. The question then is whether Sacco's belief that there was such an agreement, based upon his father's statement and the FBI agents' failure to dispel such belief, amounted to either an impermissible inducement to confess or deception rendering Sacco's statement coerced and, therefore, involuntary.

■ Whether a confession is voluntary depends on whether it is the product of a free and unconstrained choice by the person making it or whether it is the product of an overborne will. *Schneckloth v. Bustamonte,* 412 U.S. 218, 225–226, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973). The standard for determining voluntariness is whether an examination of all of the surrounding circumstances shows that the conduct of "law enforcement officials was such as to overbear [an accused's] will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). *See also United States v. Mitchell,* 966 F.2d 92, 100 (2d Cir.1992) (agents had no duty to affirmatively clarify purpose of interview leading to defendant's incriminating statement); *United States v. Mast,* 735 F.2d 745, 749 (2d Cir.1984) (defendant's misunderstanding of the purpose of the investigation does not render incriminating statement involuntary); *United States v. Ferrara,* 377 F.2d 16, 17 (2d Cir.), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967) (agent's statement that defendant would be released on bail if he confessed not an impermissible inducement).

■ All of the factors surrounding the statement are to be considered, including the nature and length of questioning, defendant's physical and mental capabilities, the government's method of interrogation, and the defendant's familiarity with law enforcement procedures. *Green v. Scully,* 850 F.2d 894, 902 (2nd Cir.), *cert. denied,* 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988) (factors include age, intelligence and education level of accused); *United States v. Mast, supra,* at 749. A court must also consider whether the defendant's will was overborne by coercion or inducement. *See Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (*per curiam*); *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897). The government must establish voluntariness by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972).

While *Bram* held that a confession "obtained by any direct or implied promise, however slight, [or] by the exertion of any improper influence," was involuntary, the rule is not applied literally. *Bram, supra,* at 542–43, 18 S.Ct. at 187. *See United States v. Ferrara, supra,* at 17. The Supreme Court has more recently clarified the rule as being that the effect of an inducement, including a promise of leniency, upon the voluntariness of an admission must be evaluated based upon all of the surrounding circumstances. *See Arizona v. Fulminante,* 499 U.S. 279, 285–86, 111 S.Ct. 1246, 1251–52, 113 L.Ed.2d 302 (1991). Additionally, where, as here, a defendant claims he had a perception or belief that he made an incriminating statement under a grant of immunity, the statement is not thereby rendered involuntary unless the perception was reasonable. *See United States v. Cahill, supra,* at 427. A defendant's failure to comprehend the full implications of his decision to speak, absent fraud or deception by the government, does not make the statement any less voluntary. *See United States v. Long,* 852 F.2d 975, 979 (7th Cir.1988).

■ However, where a defendant claims that the confession was induced by official trickery, deception or misrepresentation or where it is claimed that government investi-

gators remained silent under circumstances in which they had a duty to speak, it is the defendant's obligation to show clear and convincing evidence of a material deception. *See Mitchell, supra,* at 100; *United States v. Okwumabua,* 828 F.2d 950, 953 (2d Cir.1987), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988) (failure to advise defendant of agent's status as criminal investigator does not create duty to speak); *Mast, supra,* at 750.

 Whether a claim of voluntariness based on trickery and deception can be sustained requires a showing that government agents affirmatively misled the defendant as to the nature of the investigation and that their misrepresentations "materially induced the defendant[s] to make incriminating statements." *United States v. Mitchell, supra,* at 100; *United States v. Mast, supra,* at 750. There is no deception requiring a finding of involuntariness where the inculpatory statement is made "from a desire to cooperate, or from a defendant's ignorance of, or *inattention to,* his right to remain silent." *Mitchell, supra,* at 100 (emphasis added); *Mast, supra,* at 750. Absent a finding that a defendant made an inquiry concerning the investigation, to which a government agent's failure to respond was intended to mislead the defendant into making an incriminatory statement, there is no basis to find the requisite degree of affirmative deceit which would require a finding of involuntariness. *See Mitchell, supra,* at 100. Silence by a government agent can only be equated with an affirmative misrepresentation where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading. *United States v. Okwumabua, supra,* at 953.

 In this case, the court has conducted an extensive hearing to determine whether an agreement between John C. Sacco and the Government existed and, if so, whether such an agreement included immunity from prosecution for his son, John T. Sacco, and his brother, Richard S. Sacco, the co-defendants in this proceeding. The Government's witnesses testified consistently that despite John C. Sacco's continual effort to assert and demand that such benefits be conferred upon his son and brother as a component to his agreement to become a cooperating witness for the FBI, no such agreement in favor of them was ever made by any Government agent connected with the investigation, either verbally or in writing.

The court found the agents' testimony to be consistent in all material respects and, therefore, accepts their version of the facts as credible. While both John T. Sacco and Richard S. Sacco testified, candidly at times, on the essential points of whether or not John T. Sacco was informed by his father that he had struck a deal with the Government providing such immunity, the court does not accept John T. Sacco's recounting of the conversation during the meeting with the FBI on February 8–9, 1990, or in subsequent meetings and conversations as to this issue.

The only written agreement between John C. Sacco and the Government was a standard cooperating witness agreement which excluded any mention of immunity whether for Sacco himself, his son or brother. Sacco's own persistence with the later assistance of his attorney to include such a provision in a proposed plea agreement for the benefit of his son negates finding that there was any such agreement or understanding with the Government. Further, Agent Naum, an agent with twenty-seven years of FBI experience, testified that the FBI never grants such concessions for a son or brother of a prospective cooperating witness and, even in the rare case of considering possible immunity for a spouse of a prospective cooperating witness, such unusual benefits are never conferred before the witness has actually performed the expected cooperation.

To the extent that the evidence supports a finding that any arrangement or expectation of leniency as to his son was created by the FBI agents during their initial conversation with Sacco at his home on July 28, 1989, the court finds it was limited to the future opportunity for John T. Sacco to negotiate with the FBI his own cooperation agreement which could then lead to further concessions as would be agreed to by the United States Attorney based upon Sacco's own cooperation and guilty plea, and that the father's cooperation, if forthcoming, could have a favorable

impact on the extent of such concessions for the son. This understanding, however, in no way constituted immunity for John T. Sacco either at that time or when the FBI approached him with his father's assistance on February 8, 1990 to offer protection and seek his cooperation. There was, therefore, no agreement between John C. Sacco and the Government concerning potential or actual immunity from prosecution for the benefit of his son or his brother.

The testimony of the agents concerning the initial discussions with John C. Sacco, during the execution of the search warrant for his residence at 738 Commonwealth Avenue, clearly indicates that they intended to pursue their investigation against the son but were willing to forego it during the pendency of John C. Sacco's anticipated cooperation; the agents repeatedly stated to Sacco that, when the organized crime phase of his cooperation was completed, they would discuss with his son a separate cooperation agreement for him. (T.I.17). It may well be that the agents had then intended to proceed against John T. Sacco, and that this action was postponed as an inducement to obtain John C. Sacco's cooperation. Such a postponement would also square with Sacco's statements to his son about the favorable effect his cooperation had, in his view, had upon his son's status. However, such short-term forbearance by the Government from initiating formal prosecution cannot reasonably be interpreted as a grant of immunity for Sacco's son or brother.

This was, moreover, the position taken by the Government throughout its efforts to obtain productive cooperation from Sacco, during his cooperating witness relationship with the government between July, 1989 and June, 1990, when Sacco was arrested and prosecuted. Even Sacco's attorney testified that, except for apparently facetious remarks by two of the agents as to how Agent Webb was able to persuade Sacco to cooperate, all agents involved with Sacco consistently contradicted Sacco's assertions that his deal with the Government included any immunity for his son or brother. It is also clear that Sacco at no time mentioned that his brother Richard was included in the agreement which his attorney was attempting to negotiate with the FBI on his behalf. (T.VII.25–26). As noted, the only written instrument reflecting any agreement between John C. Sacco and the Government, Government's Exhibit 14, a standard cooperating witness agreement, explicitly negates any arrangements or understandings not specifically provided for in the agreement. *See* Government's Exhibit 14 at ¶¶ 13, 14. Additionally, it is highly unlikely that the Government would have given up the advantage it then possessed by agreeing to grant immunity to John T. Sacco or Richard Sacco well before John C. Sacco's cooperation was fully provided.

Defendant's reliance on *United States v. San Pedro,* 781 F.Supp. 761 (S.D.Fla.1991), where the court held the government to the terms of its immunity agreement, is misplaced. The record in the instant case does not support the existence of such an agreement. Therefore, there is no contract to which the Government may be held.

■■■■ Sacco also contends that, based on his father's statements to him and the agents' failure to contradict those statements, he believed that such immunity had been conferred upon him thereby rendering his statements involuntary. However, the record shows that Sacco failed to establish that even if he had such a belief that it was a reasonable one. First, Sacco's testimony that, during the meeting at the restaurant on February 8th, he was unwilling to specifically admit Agent McLane's assertions of criminal activity on his part and only acknowledged he had heard and understood what Agent McLane had told him (T.III.159, T.IV.23–24), strongly suggests that he had deep reservations as to whether what he now claims his father had told him regarding the supposed promise of immunity for him, was true. (T.IV.24,25–26).

Second, Sacco's own testimony about his meeting with his father and the FBI undermines his position. Sacco testified that he was "stunned" to hear his father say he had become an FBI cooperating witness. (T.III. 142,143). This disbelief persisted during the consequent discussions that evening and, according to Sacco, rather than acquiesce in Agent's McLane descriptions of his criminal

conduct, Sacco repeatedly requested an opportunity to talk privately with his father. These requests were denied ostensibly for reasons of security for the father. It is not credible for Sacco to now claim that despite his admitted reservations as to the truth of his father's representations that he was cooperating with the FBI, he nevertheless fully accepted and relied upon his father's more significant assertion of having obtained immunity for him based on his father's activities about which Sacco was admittedly, up to that time, completely unaware. (T.III.142). The fact that the FBI agents were present at the meeting proposing security for Sacco and his family would have tended to corroborate his father's representations of cooperation, but Agent McLane's recitations of the details of Sacco's involvement in the Arizona–Buffalo drug-running conspiracy coupled with a specific suggestion that he should also cooperate with the FBI, contradicted any assertion by his father that Sacco had a "jail free card" in hand.

Third, the absence of any reasonable basis for Sacco's asserted belief as to having been an unsuspecting recipient of a "jail free card" is further demonstrated by the fact his father's reputation for truth was notoriously poor, so weak that even his uncle said his brother's words would "go in one ear and out the other." Sacco also admitted to having had a life-long relationship with his father and, accordingly, his father's weak reputation for truthfulness must have been a fact he was well aware of in February, 1990.

Fourth, the record establishes that Sacco's own recollections of exactly what his father said varied materially during the course of his testimony. For example, when initially asked on direct examination by his attorney what his father said to him when they first met at the parking lot prior to Sacco agreeing to go to the restaurant with the agents, Sacco stated that his father said, "The only reason that he [John C. Sacco] would ever consider cooperating was to help us out." (T.III.143). Sacco then testified that further into the initial conversation with his father, his father said "... listen, relax. My deal includes taking care of you ... all you got to do is listen to what these guys [FBI agents]

have to say." (T.III.144). Once at the restaurant, Sacco testified that as the FBI would not allow him to meet privately with his father, his father "suggested that it was okay, that he had a deal with the FBI." (T.III.150). Responding to his attorney's request for specifics, Sacco again testified that "my father wanted to me relax ... he said just take it easy. You don't have anything to worry about. They [the FBI] came with a warrant ... in July of '89 ... for him, and my uncle, and myself ... that his cooperation with the government was to halt anything against me and my uncle and that we were to be offered some kind of protection." (T.III.152). Later Sacco stated that McLane also told him that "when my father decided to cooperate in July of '89, that all action against me was halted, and that I was going to be offered this federal protection program." (T.III.156). Significantly, up to this point in Sacco's recollection of the conversations, immunity is never mentioned. Sacco later sought to modify the vague nature of these statements by testifying that "my father kept saying don't worry, you're covered under my deal with them. And Jeff McLane didn't say you're covered under your father's deal. None of them [FBI agents] said that but none of them said anything to the contrary, so I just assumed while I was sitting there that I didn't have anything to worry about as far as any criminal prosecution." (T.III.157).

Later in his testimony, when asked to clarify what if anything the agents said to cause him to believe he had given some form of immunity, Sacco testified that his "father['s] [told] me ... these guys are my friends, and nothing's going to happen to you." (T.III. 159). In only one of these recountings did Sacco specifically recall any reference by his father to the question of immunity. Again it is later in his testimony that Sacco, for the first time specifically stated that he was to tell his uncle Richard that "he was covered with me, and then no prosecution of any crime." (T.III.169). During cross-examination, however, Sacco also stated that he didn't believe he would suffer any criminal implication in meeting with the FBI because his father had told him not to worry and because he did not specifically acknowledge

any criminality. (T.IV.22–23). The court does not accept Sacco's claim that he reasonably believed he had immunity when his own recollections of the specific statements he says his father made to him refer only to a "deal" without any further explanation that the "deal" included immunity.

In an effort to bolster his recollection that his father had referred to immunity for him as part of the father's cooperation with the FBI, Sacco testified that during the conversation at the restaurant, his father strongly objected to Agent McLane's statement that it would be necessary for John T. Sacco to cooperate with the FBI in order to obtain considerations from the Government in respect to his potential future prosecution. (T.III.164). This assertion was flatly contradicted by the agents who were present. (T.VIII.186–87) (Thurston), (T.IX.7,8) (McLane), (T.IX.70–71) (Watts). Moreover, it is unlikely that his father would object to McLane's request for cooperation if it was the case that Sacco had already gained immunity.

Sacco's unwillingness to accept at face value his father's representations as to possible immunity also undercuts Sacco's primary contention that his father's statements taint the admissibility of the incriminatory statements the FBI agents attribute to him at the meeting on February 8, 1990. Even if, *arguendo,* such statements were made and, based upon his father's status as a cooperating witness, can be properly attributed to the Government, given Sacco's age, experience, his awareness he was the target of a criminal investigation and that his interlocutors were FBI agents, and the non-coercive circumstances of the meeting, the representation, standing alone, does not justify a finding that Sacco's statements were improperly induced and thereby rendered involuntary.

There is, however, no evidence to support a finding that the FBI directed the father to make the statements for the purpose of inducing his son's admissions. The record clearly establishes that the primary purpose of the meeting was to persuade Sacco (and, later, his uncle Richard), to accept FBI protection and only secondarily to initiate discussions which might lead to Sacco's coopera-

tion with the Government. It is conceded that there was no interrogation by the FBI of Sacco, rather, Sacco listened to Agent McLane's outline of the FBI's case against him which was done for the purpose of persuading Sacco to cooperate with the FBI along with receiving protection. The record is also devoid of any attempt by Sacco to ascertain the truth of his father's assertion of immunity by his asking any questions of the agents to verify such an important matter to him. Sacco does not claim the agents acted in an overbearing manner as to prevent such inquiry. His incriminatory acknowledgments and statements in response were thus not the product of his father's assertions of any grant of immunity but rather were the result of his desire to cooperate, a mistaken belief that he would not be prosecuted, or simple inadvertence. The admissions were, in any case, voluntary and not the result of fundamentally unfair or other misconduct on the part of the agents. In short, Sacco has failed to show that his belief that his father's cooperation had conferred immunity upon him was reasonable, rather, such belief is belied by the evidence. There is, therefore, no basis for any claim by Sacco that his father's involvement in the FBI decision to contact and discuss with Sacco the need for protection of him and his family or his potentially becoming a cooperating witness, violated Sacco's right to due process.

■ Sacco has also failed to meet his burden by clear and convincing evidence that his statements are the product of FBI deception. Here the court has found that the agreement, as claimed by the Saccos to provide them with a "jail free card" or "freebie," did not exist and that John C. Sacco did not tell his son that his cooperation had gained him immunity. The record shows that during the restaurant conversation. Sacco was aware that he was dealing with the FBI agents, and that he was a target of an ongoing drug trafficking investigation. Even assuming that the father made some reference to his deal with the FBI, Sacco, who was not interrogated, made no effort to confirm with the agents as to what his father's deal was, how it benefitted him, or whether it included a grant of immunity. There is,

therefore, no basis to find that the agents had a legal or moral duty to clarify of specifically negate any assertion by Sacco's father regarding a deal which may have included his son so as to prevent Sacco from making an incriminatory statement based on a misunderstanding of the actual facts. Rather, the court concludes that statements as attributed to Sacco were the result of a desire to cooperate, or his ignorance of or, as is more likely, inattention to his right to remain silent. *See Mitchell, supra* at 100; *Mast, supra,* at 751.

Based on the record, the court finds that John C. Sacco did not in the presence of the agents ever say that his son had already received immunity from prosecution based on an agreement he claimed to have with the Government. Alternatively, if the district court finds, contrary to this recommendation, that John C. Sacco in fact made such statements in the presence of the agents, it should also be found that John T. Sacco's statement resulted from a mistaken and unreasonable belief that his father's deal had gained immunity for him and his uncle and that his statements were, nevertheless, "freely self-determined" and, therefore, voluntary. *See United States v. Mast, supra,* at 751; *United States v. Long, supra.* The record shows that as the agents did not affirmatively promote or authorize John C. Sacco's assertions and that John T. Sacco did not ask the agents whether his father's statement was true, there was no failure by the agents to make a truthful response upon which a finding of deception may be based. Also, as noted, Sacco made no effort during the hearing to show that the asserted statements by John C. Sacco to his son had been directed by the FBI.

While it was a secondary purpose of the conversation at the restaurant to obtain John C. Sacco's cooperation regarding the marijuana smuggling investigation and other matters, a request for cooperation does not, in itself, render incriminatory statements made in response involuntary. *See United States v. Fisher,* 700 F.2d 780, 782–83 (2d Cir.1983).

Finally, the circumstances of the conversation between Sacco and the FBI agents was entirely non-coercive, and Sacco has con-

ceded this fact. It occurred in a public restaurant in the presence of his father and lasted only forty-five minutes to an hour during which Sacco never asked to leave. (T.IV.14). Sacco also agreed he would not have had to go with the agents to the restaurant if he had chosen not to. The court finds that Sacco was also free to leave the restaurant, regardless of any inconvenience in returning to his vehicle should the agents not have provided a ride back to the parking lot where it was located. No guns were drawn and there was no testimony the agents conducts themselves in a threatening or even unfriendly manner as they were there primarily to propose government protection for Sacco and his family. Sacco, himself, was at the time forty years old (T.III.171), a businessman (T.IV.37,94), and a person able, according to him, to organize a potential $1 million investment in a new business venture. (T.IV.59–60). Additionally, Sacco was married, had a family and owned a substantial home in the suburbs. (T.III.134,162,170).

█ The same analysis applies to all of the meetings between Richard Sacco and the Government agents. These were held in public restaurants to which Sacco came of his own volition. He was free to leave at any time and his prior experience as a police officer negates any reasonable possibility Sacco was unaware of his right to not to speak with the agents and the risk, which he candidly acknowledged, of doing so without the assistance of an attorney. His acknowledged awareness of his brother's lack of trustworthiness also contradicts his asserted belief that his brother had obtained immunity for him prior to his incriminating statements to the FBI agents.

Accordingly, the court finds that on the record of the hearing, there is no basis to conclude that any agreement or understanding, either written or verbal, formal or informal, existed at any time between John C. Sacco and the Government providing any form of immunity to either John T. Sacco or Richard S. Sacco as to their prior criminal activities. Further, both John T. Sacco and Richard Sacco failed to establish their belief that any such agreement existed was a reasonable one, rather, the evidence fairly ne-

gates any basis whatsoever for such a claim. Additionally, there was no obligation by the agents to rebut any immunity claim by John C. Sacco for his son even if one had been made in their presence. Sacco therefore failed to show that the agents' conduct was deceptive. Finally, the Government has shown by a preponderance of the evidence that, under all circumstances, the statements made by both John T. Sacco and Richard Sacco were voluntary, and there was, accordingly, no violation of their right to due process.

## CONCLUSION

Based on the foregoing discussion, Defendants' motions to suppress should be DENIED.

Dated: September 13th, 1994

Buffalo, New York